**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Terrence Moore,** *et al.,* | |
| **Plaintiffs,** | |
| -against- | **14-CV-8326 (CM)(JLC)** |
| **Navillus Tile, Inc., d/b/a Navillus Contracting,** *et al.,* | |
| **Defendants.** | |
| **Thomas Gesualdi,** *et al.,* | |
| **Plaintiffs,** | |
| -against- | **15-CV-08441 (CM)(JLC)** |
| **Navillus Tile, Inc., d/b/a Navillus Contracting,** *et al.* | |
| **Defendants.** | |

**TRIAL MEMORANDUM OF DEFENDANTS NAVILLUS TILE, INC.,**
**DONAL O'SULLIVAN, AND HELEN O'SULLIVAN**

Willis J. Goldsmith
Lee A. Armstrong
JONES DAY
250 Vesey Street
New York, New York 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
wgoldsmith@jonesday.com
laarmstrong@jonesday.com

Attorneys for Defendants Navillus Tile,
Inc., Donal O'Sullivan, and Helen
O'Sullivan

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ......................................................................... 1

II.     FACTS ............................................................................................................... 2

      A.   Navillus ...................................................................................................... 2

      B.   Time Square ............................................................................................... 2

      C.   ACS ........................................................................................................... 4

III.    THIS LITIGATION ........................................................................................... 5

IV.     LEGAL STANDARD ......................................................................................... 5

V.      ARGUMENT ..................................................................................................... 6

      A.   Time Square is Not the Alter Ego of Navillus ........................................... 7

           1.   Time Square and Navillus Do Not Have Substantially Identical Management, Supervision, and Ownership ...................................... 7

           2.   Time Square and Navillus Do Not Have Substantially Identical Business Purposes ...................................................................... 9

           3.   Time Square and Navillus Do Not Have Substantially Identical Operations .................................................................... 10

           4.   Time Square and Navillus Do Not Have Substantially Identical Equipment ..................................................................... 11

           5.   Time Square and Navillus Do Not Have Substantially Identical Customers ..................................................................... 12

           6.   There is No Anti-Union Animus ................................................... 12

      B.   ACS is Not the Alter Ego of Navillus ..................................................... 14

           1.   ACS and Navillus Do Not Have Substantially Identical Management, Supervision, or Ownership .................................... 15

           2.   ACS and Navillus Do Not Have Substantially Identical Business Purposes ...................................................................... 16

           3.   ACS and Navillus Do Not Have Substantially Identical Operations ......... 17

           4.   ACS and Navillus Do Not Have Substantially Identical Equipment ......... 19

           5.   ACS and Navillus Do Not Have Substantially Identical Customers ......... 19

           6.   There is No Anti-Union Animus ................................................... 20

      C.   Post-Discovery Evidence .......................................................................... 21

      D.   Individual Liability Claims ....................................................................... 23

           1.   The Controlling Corporate Official Prong is Not Met................... 23

           2.   The Pension Funds Were Not Defrauded ................................... 24

VI.     CONCLUSION ................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. A & M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc. ("A & M Heating"),*
314 F. Supp. 2d 332 (S.D.N.Y. 2004)....................................................................11, 12, 18, 19

*Armen Digital Graphics, Ltd. v. Amalgamated Lithographers,*
1997 WL 458738 (S.D.N.Y. Aug. 12, 1997)................................................................ passim

*Bd. of Trustees of Plumbers, Pipefitters & Mech. Equip. Serv., Local Union No. 392 Pension Fund v. Humbert,*
2017 WL 1177505 (S.D. Ohio Mar. 30, 2017).............................................................15, 21

*Blue & White Cabs,*
291 N.L.R.B. 1047 (1988) ....................................................................................................14

*Canada Dry Bottling Co. of N.Y.,*
2000 WL 1886616 (S.D.N.Y. Dec. 29, 2000) ..................................................................9, 16

*Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo ("Lollo I"),*
35 F.3d 29 (2d Cir. 1994) ............................................................................................23, 24, 25

*Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo ("Lollo II"),*
148 F.3d 194 (2d Cir. 1998).................................................................................................25

*EMI Music Mktg. v. Avatar Records, Inc.,*
334 F. Supp. 2d 442 (S.D.N.Y. 2004).................................................................................22

*Finkel v. S.I. Assocs. Co.,*
2008 WL 2630297 (E.D.N.Y. June 30, 2008) ..............................................................6, 8, 16

*L&J Equipment,*
274 N.L.R.B. 20 (1985) ...............................................................................................14, 18, 20

*Lihli Fashions Corp. v. N.L.R.B.,*
80 F.3d 743 (2d Cir. 1996).............................................................................................6, 13, 20

*Marino Elec., Inc.*,
　285 N.L.R.B. 344 (1987) ........................................................................ passim

*Mason Tenders Dist. Council Welfare Fund v. Kan Klean Indus.*,
　1996 U.S. Dist. LEXIS 11295 (S.D.N.Y. Aug. 7, 1996) .........................8, 11, 18, 20

*Newspaper Guild of N.Y., Local No. 3 v. N.L.R.B. ("Local No. 3")*,
　261 F.3d 291 (2d Cir. 2001) ................................................................... passim

*N.Y. State Teamsters Conference Pension & Ret. Fund ex rel. Bulgaro v. Doren
　Ave. Assocs., Inc. ("Doren Ave.")*, 321 F. Supp. 2d 435 (N.D.N.Y. 2004),
　*aff'd sub nom. Express Servs., Inc.*, 426 F.3d 640 (2d Cir. 2005) .................. passim

*Sasso v. Cervoni*,
　985 F.2d 49 (2d Cir. 1993), *cert. denied*, 508 U.S. 973 (1993) ........................23, 24

*Time Square Const., Inc. v. Mason Tenders Dist. Council of Greater N.Y. & Long
　Island*,
　2008 WL 55116 (S.D.N.Y. Jan. 2, 2008) .....................................................8, 9, 11

*Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Co-
　op., Pension & Welfare Funds v. JJJ Concrete Corp. ("JJJ Concrete")*,
　2015 WL 790085 (E.D.N.Y. Feb. 24, 2015) ................................................ passim

*Trustees of Plumbers & Pipefitters Nat. Pension Fund v. De-Con Mech.
　Contractors, Inc.*,
　896 F. Supp. 342 (S.D.N.Y. 1995) ............................................................23, 24

*Trustees of the United Health & Welfare Fund v. N. Kofsky & Son, Inc.*,
　2015 WL 59173 (S.D.N.Y. Jan. 5, 2015) .................................................... passim

*United States v. Sci. Applications Int'l Corp.*,
　301 F.R.D. 1 (D.D.C. 2013) ....................................................................21, 23

*United Union of Roofers, Waterproofers, & Allied Workers Local No. 210, AFL-
　CIO v. A.W. Farrell & Son, Inc. ("A.W. Farrell")*,
　2012 WL 4092598 (W.D.N.Y. Sept. 10, 2012), aff'd sub nom. 547 F. App'x
　17 (2d Cir. 2013) ................................................................................. passim

## I.      PRELIMINARY STATEMENT

Over the past 30 years, Donal O'Sullivan ("Donal") has grown Navillus Tile, Inc. ("Navillus") from a small tile contractor into a large, diversified union construction firm.  A union shop since 1989, Navillus employs over a thousand union workers every year and is one of the largest contributors to jointly-administered Taft-Hartley union trust funds, including the Plaintiffs in this case, to whom Navillus has made increasingly large contributions since 2011.

Plaintiffs do not contend that Navillus has failed with respect to its obligations as to work performed by Navillus.  In fact, Navillus has contributed over $170 million to union benefits funds since 2011, including over $80 million to the Plaintiffs' funds and over $19 million to the Plaintiffs' funds in 2016 alone.  Instead, Plaintiffs seek to compel Navillus to make contributions based on work performed by two wholly separate entities, Time Square Construction ("Time Square") and Advanced Contracting Solutions ("ACS"), neither of which is a party to any collective bargaining agreements, on the theory that Time Square and ACS are each an "alter ego" or the "disguised continuance" of Navillus designed to evade Navillus' obligations to the funds.

For nearly ten years, Plaintiffs and their affiliate unions have engaged in a campaign of intimidation and litigation against Navillus, Time Square, and ACS to coerce Time Square and ACS into recognizing the unions.  They have picketed job sites, sought to compel arbitration against Time Square, distributed fliers depicting Donal and his brother Kevin O'Sullivan ("Kevin") as pigs, distributed stickers seeking anonymous tips asking "Is Navillus going non-union?", staked out construction sites, and hired "salts" to work undercover on jobs, and engaged outside consultants to investigate the Defendants.

Despite these efforts, Plaintiffs have cobbled together only unremarkable evidence of familial and personal ties between individuals at these companies, which relationships Defendants do not deny.  Nonetheless, at trial, Plaintiffs will attempt to piece this evidence

together, with little more than speculation and innuendo, into a grand conspiracy theory, one which is undermined by the reality that Navillus, Time Square, and ACS remain distinct, viable entities, and which is woefully insufficient to meet Plaintiffs' burden of proof.

## II.   FACTS

### A.   Navillus

Donal emigrated to the United States from Ireland in 1984 to find construction work.  In 1987, Donal and his brothers Kevin and Leonard formed Navillus as a small contractor performing home remodeling and repair jobs.  In 1989, Navillus won its first major bid and signed its first union contract to complete the work.  Since then, Navillus has expanded the services it provides and grown into one of the largest union construction firms in the City.

Navillus has been under Donal's sole direction since Kevin left in 2006 to form Time Square.  (Leonard had left in 1998.)  Donal has been the sole owner of Navillus since he purchased Kevin's 50% interest in January 2015.  Navillus is primarily a subcontractor performing masonry, concrete, stone, tile, steel, restoration, repointing, roofing, carpentry, electrical, plastering, and fireproofing on large union projects.  Navillus is a prime or general contractor only on public repair or restoration jobs where it self-performs most of the work.

Navillus has its own facilities and bank accounts, files its own taxes, and pays for all of its own insurance, equipment, labor, and professional services, which it does not share or provide to any other company.  Navillus owns and rents millions of dollars of equipment and has served over 100 clients on hundreds of jobs since 2011.

### B.   Time Square

In 2006, Kevin resigned from Navillus and formed Time Square.  Since its founding, Kevin has been wholly responsible for Time Square's management and day-to-day operations. Initially, Kevin and Donal each owned 50% of Time Square.  In April 2012, Kevin purchased

2

Donal's shares.  Time Square is a general contractor on new, private construction.  While Time Square was Navillus' customer on two jobs nearly a decade ago – creating union jobs and generating substantial payments to Plaintiffs' funds – Time Square and Navillus do not share customers, which is not surprising given that they are not in the same business.

### Sugar Hill Project

In early 2012, Navillus submitted a bid to Mountco Construction ("Mountco"), the general contractor for Sugar Hill, a prevailing wage project in West Harlem, to perform concrete work.  During the bid process, Donal and Peter Downes, Navillus' Chief Estimator, met with Mountco representatives, including owner Joel Mounty.  Navillus later learned that it would not get the work because Mountco would only use a non-union subcontractor.  After learning this, Donal asked Kevin whether Time Square was interested in bidding the job and, in April 2012, Time Square submitted a bid.  No one at Navillus prepared or reviewed Time Square's bid.

As discussions progressed between Mountco and Time Square, Kevin sought Donal's advice.  Donal suggested Kevin speak to John Kuefner, a Navillus project manager working on a job that was nearing completion at 1717 Broadway and who did not have his next project secured.  Kevin called Kuefner and hired him through Kuefner's consulting firm.  Kevin hired Hazel Corcoran (a former Navillus employee who left in 2008) through her consulting firm to negotiate the contract.  Kevin also asked Donal to review the contract.  Donal agreed as a favor to his brother, but his role was limited to being copied on emails and participating in a single call.  After Time Square got the contract, Kuefner contacted Eoin Moriarty ("Moriarty"), a cost controller at Navillus, to help with prevailing wage compliance.  Moriarty asked Donal for his approval to consult on Sugar Hill.  Donal did not object so long as the work did not interfere with his Navillus work.  Kevin hired Moriarty and paid him as a consultant through Moriarty's consulting firm.  Donal had no role in the operations or management of the construction work on

3

Sugar Hill.  Nonetheless, Mounty sent Donal emails related to compliance issues when he did

not get prompt responses from Time Square.  Donal had no other involvement with the project.

## C.   ACS

ACS was founded by Moriarty in the summer of 2013, shortly before he quit Navillus.

Moriarty and William O'Donnell each own 50% of ACS.  Hazel Corcoran was a 1/3 owner of

ACS prior to selling her interest to Moriarty and O'Donnell in 2015.  Downes briefly owned

ACS during the first few months of its existence, as described below.  Donal was not involved in

ACS' formation, nor has he ever owned ACS, and he has never been involved with ACS's

management or day-to-day operations.  ACS works on non-union or open shop concrete jobs and

does not perform work as a prime or general contractor.  Apart from one job, ACS has no

common customers with Navillus.

### 1.   Moriarty Creates TMG and ACS

Moriarty established The Moriarty Group, LLC ("TMG") while employed by Navillus in

May 2012.  In 2013, Moriarty and Kuefner began submitting bids for non-union work through

TMG.  Moriarty asked his friend Downes to review TMG's bids prepared by Kuefner.  TMG

won the West 21st Street bid in the summer of 2013, at which point Moriarty advised Donal that

he was leaving Navillus.  By then, Moriarty had formed ACS to obtain more favorable insurance

rates for the Boston Road job.  Moriarty asked Downes to be his partner and founding member of

ACS, providing Downes an opportunity to share in ACS's profits while continuing to lend his

expertise and credibility to the project.  Downes agreed, believing his role would be limited, and

it was.  However, Downes quickly became disillusioned with even this limited role and, within a

few months, he sold his interest in ACS.  Downes has had no involvement with ACS since.

4

Soon after Moriarty formed ACS and left Navillus in August 2013, Moriarty asked Donal for a series of loans to perform the work on jobs he had lined up.  Donal personally lent Moriarty $1,800,000 in short-term, interest-bearing loans.  Moriarty repaid all three loans by January 2014.

### 2.   Boston Road

By the end of August 2013, ACS won the bid for the concrete work on Boston Road, which was developed by Mountco.  Donal had no role in the bid, contract negotiations, operations or management of Boston Road.  Nonetheless, during a dispute between ACS and Mountco in November 2013, Mounty began copying Donal on emails to Hazel Corcoran.  At first, Donal did not respond.  However, while meeting with Eoin one evening, Eoin described concerns with the project and asked Donal for help.  Moriarty and Donal together wrote an email to Mounty from Moriarty's iPhone and signed it "Donal."  While Mountco employees continued to reach out to Donal occasionally thereafter, Donal ignored them and had no further involvement with Boston Road or any other ACS project.

## III.   THIS LITIGATION

Plaintiffs filed this now consolidated action claiming, among other things, that Defendants Navillus, Time Square, and ACS are alter egos and violated ERISA and the LMRA by failing to make contributions to Plaintiffs' funds for work performed by Time Square and ACS employees.  (Moore Dkt. 1, ¶¶ 71, 92; Gesualdi Dkt. 11, ¶¶ 149, 159.)  Plaintiffs also allege that Donal, Helen, and Kevin personally engaged in common law fraud under ERISA by failing to include hours worked by Time Square and ACS employees on the remittance forms that Navillus submitted to Plaintiffs.  (Moore Dkt. 1, ¶ 120; Gesualdi Dkt. 11, ¶ 162.)

## IV.   LEGAL STANDARD

The alter ego doctrine is an "exception to the doctrine of limited liability."  *United Union of Roofers, Waterproofers, & Allied Workers Local No. 210, AFL-CIO v. A.W. Farrell & Son,*

*Inc. ("A.W. Farrell")*, 547 F. App'x 17, 19 (2d Cir. 2013).  Accordingly, "[T]he law only treats the employees of a corporate entity as the employees of a [separate] entity under extraordinary circumstances."  *Id.*

"The focus of the alter ego doctrine… is on the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations."  *Lihli Fashions Corp. v. N.L.R.B.*, 80 F.3d 743, 748 (2d Cir. 1996) (internal citations and quotation marks omitted); *Armen Digital Graphics, Ltd. v. Amalgamated Lithographers*, 1997 WL 458738, at *7 (S.D.N.Y. Aug. 12, 1997); Moore Docket 165, Summary Judgment Decision.  Thus, the alter ego doctrine "usually comes into play when a new legal entity has replaced the predecessor (or at least the unionized portion of the predecessor)."  *Newspaper Guild of N.Y., Local No. 3 v. N.L.R.B. ("Local No. 3")*, 261 F.3d 291, 303 (2d Cir. 2001) (internal quotation marks omitted).

To determine whether an entity is a disguised continuance of another, courts consider whether they have "substantially identical management, business purpose, operations, equipment, customers, supervision, and ownership."  *Id.* at 294; *Lihli Fashions*, 80 F.3d at 748.  Courts also consider whether there is evidence of "anti-union animus or an intent to evade union obligations."  *Id.*  Plaintiffs bear the burden of proving extraordinary circumstances warranting application of the alter ego doctrine.  *A.W. Farrell*, 547 F. App'x at 19; *Finkel v. S.I. Assocs*, 2008 WL 2630297, at *12 (E.D.N.Y. June 30, 2008).  "[S]eparate alter ego determinations must ultimately be made for" Time Square and ACS.  Moore Dkt. 204, pp. 7-8 (citing *Lihli Fashions*, 80 F.3d at 748).

## V.    ARGUMENT

Neither Time Square nor ACS is or has ever been an alter ego or the "disguised continuance" of Navillus.  *Lihli Fashions*, 80 F.3d at 748.  Neither Time Square nor ACS is a "sham transaction or technical change" to avoid Navillus' union obligations.  *Id.*  Neither Time

Square nor ACS "replaced" Navillus or any "unionized portion" of Navillus.  *Local No. 3*, 261 F.3d 291 at 299.  To the contrary, the record reflects that Navillus is a continuing and thriving union construction firm – and a major contributor to Plaintiffs' funds – and that it does not have substantially identical management, business purpose, operations, equipment, customers, supervision, or ownership with either Time Square or ACS.

A.      **Time Square is Not the Alter Ego of Navillus.**

Time Square and Navillus are wholly separate, viable companies performing different work in different markets for different customers under different ownership and management and with separate operations.

1.      **Time Square and Navillus Do Not Have Substantially Identical Management, Supervision, and Ownership**

Donal has been the 100% owner of Navillus since 2015 and he has been solely responsible for Navillus' management since Kevin resigned from Navillus in 2006.  Kevin has been the 100% owner of Time Square since 2012 and he has been solely responsible for Time Square's management since he formed the company in 2006.

The mere fact that Donal and Kevin are brothers does not establish substantially identical ownership.  *A.W. Farrell*, 2012 WL 4092598 at *13; *Armen Digital*, 1997 WL 458738, at *7 n.9 ("Were courts to assume alter ego status merely from [family relationships], families would be effectively precluded from organizing their business affairs in any but a single corporate entity."); *Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Co-op., Pension & Welfare Funds v. JJJ Concrete Corp. ("JJJ Concrete")*, 2015 WL 790085, at *9 (E.D.N.Y. Feb. 24, 2015) (family connections only relevant if all factors met).  Nor does the fact that Kevin retained a non-controlling stake in Navillus prior to this lawsuit or that Donal had a non-controlling stake in Time Square prior to 2012.  *Mason Tenders Dist. Council Welfare Fund v.*

*Kan Klean Indus.*, 1996 U.S. Dist. LEXIS 11295, 1 (S.D.N.Y. Aug. 7, 1996) (no substantially identical ownership where majority owner of alleged alter ego was non-controlling owner of union company); *Trustees of the United Health & Welfare Fund v. N. Kofsky & Son, Inc. ("N. Kofsky"),* 2015 WL 59173, at *10 (S.D.N.Y. Jan. 5, 2015) (owner of union company was 51% owner of non-union company); *see also Time Square Const., Inc. v. Mason Tenders Dist. Council of Greater N.Y. & Long Island*, 2008 WL 55116, at *6 (S.D.N.Y. Jan. 2, 2008) (common ownership not sufficient).

Moreover, Plaintiffs' only evidence of overlap in management between the companies is Donal's assistance to his brother with a single project, Sugar Hill.  However, the record reflects that Donal's involvement with the contract negotiations for Sugar Hill was ultimately limited and that he had no involvement with management of the work performed, notwithstanding overtures by Mounty to Donal regarding compliance issues when he could not get the attention of Time Square.  This limited assistance from one brother to another is wholly unremarkable and not nearly sufficient to establish any of the alter ego factors.  *A.W. Farrell*, 2012 WL 4092598 at *7 (no substantially identical management; union shop manager held weekly meetings with non-union manager, claimed to speak for non-union shop in dispute); *Armen Digital*, 1997 WL 458738, at *9 (owner of one company represented self as "president" of the other, stated she was "in charge here"; shared check-signing authority across companies); *Finkel*, 2008 WL 2630297, at *13 (occasional assistance from brother "insufficient to sustain Plaintiff's burden of proving common ownership and management"); *Time Square*, 2008 WL 55116, at *6 (occasional signing of documents by non-controlling owner not sufficient to establish common management); *Kan Klean*, 1996 U.S. Dist. LEXIS 11295, at *19-20.  Moreover, the hiring of three former Navillus employees and one then-current Navillus employee (as an independent contractor) to work on a

single Time Square job is not sufficient to establish that Navillus and Time Square had

substantially identical management or supervision.  *Canada Dry Bottling Co. of N.Y.*, 2000 WL

1886616, at *4 (S.D.N.Y. Dec. 29, 2000) ("[T]he mere transfer of low and middle managers does

not establish an identity in the management.").

**2.**   **Time Square and Navillus Do Not Have Substantially Identical Business Purposes**

Time Square and Navillus have separate business purposes.  "The main focus of the alter-

ego inquiry is to determine whether the two employers are the same business in the same market."

*Express Servs.*, 426 F.3d 640, 650 (2d Cir. 2005) (internal citation and quotation marks omitted);

*see also Local No. 3*, 261 F.3d at 299, 301 ("differences in financial and strategic goals" relevant

to business purpose).  Navillus is a union construction company engaged in multiple types of

subcontracting work on union and prevailing wage jobs and as a prime or general contractor on

publicly funded repair and restoration jobs where it self-performs the majority of the work.  Time

Square is a non-union general contractor on private development.  *A.W. Farrell*, 2012 WL

4092598, at *14-15 (separate business purposes; union contractor "derives a substantial portion

of its income from . . . contracts subject to prevailing wage requirements," which the non-union

contractor did not perform); *Armen Digital*, 1997 WL 458738, at *8 (lithography companies had

separate business purpose because they used different methods); *Marino Elec., Inc.*, 285 N.L.R.B.

344, 354-55 (1987) (union electric subcontractor could not compete for the same work as non-

union electric subcontractor); *see also Time Square*, 2008 WL 55116, at *6.

The fact that Navillus and Time Square both operate in the construction industry is

insufficient to establish substantially identical business purposes.  *Express Servs.*, 426 F.3d at

650; *see also Local No. 3*, 261 F.3d at 299, 301.  Nor does the fact that Time Square worked as a

concrete subcontractor on a single project suffice to establish substantially identical business

9

purposes.  *N. Kofsky*, 2015 WL 59173, at *10 (while both companies performed plumbing work, they had separate business purposes where one company performed complete renovations whereas alleged alter ego's work was much more limited in scope); *JJJ Concrete Corp.*, 2015 WL 790085, at *10 (even though "both Defendants may lay concrete, that is where the similarity ends").  Rather, the fact that Navillus had already been rejected for the Sugar Hill project specifically because it was a union shop demonstrates that even on this single occasion, Time Square and Navillus operated in different markets.  *Id.* at *8-10 (different business purposes where companies "do not, and cannot, cater to the same clients"); *Marino Elec.*, 285 N.L.R.B. at 354-55.  And even though Navillus and Time Square both work as general contractors, they do not compete with each other since Navillus is only a general contractor on public restoration and repair jobs where it can self-perform the work.  Time Square does not work on public jobs, does not generally self-perform work, and almost exclusively works on new construction.

### 3. Time Square and Navillus Do Not Have Substantially Identical Operations

Time Square and Navillus do not have substantially identical operations.  Time Square and Navillus each have separate offices and facilities with independent telephone and computer systems.  They each have separate employees and separate payroll management and business systems.  Each company files its own taxes, maintains separate financial statements, and has its own insurance policies and keeps separate accounts at different banks.  *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. A&M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc. ("A&M Heating")*, 314 F. Supp. 2d 332, 349 (S.D.N.Y. 2004) (no substantially identical operations where companies had separate facilities); *N. Kofsky*, 2015 WL 59173, at *10 (separate bank accounts and leases); *JJJ Concrete Corp.*, 2015 WL 790085, at *9 ("Defendants never comingled bank accounts or…financial accounts" and did not share insurance).

10

Nonetheless, Plaintiffs will argue that Time Square and Navillus are alter egos because they once had adjacent yards in Queens (with separate leases) separated by a ten-foot high fence and because Time Square assumed the lease on a yard in New Jersey after Navillus ceased using the facility.  But neither comes close to establishing substantially identical operations.  *Kan Klean*, 1996 U.S. Dist. LEXIS 11295, at *21 (adjacent offices did not support alter ego finding); *A.W. Farrell*, 2012 WL 4092598 at *13 (rent-free use of facility owned by owner of union shop did not establish identical operations); *Armen Digital*, 1997 WL 458738, at *7, *9 (shared offices did not establish substantially identical operations); *JJJ Concrete Corp.*, 2015 WL 790085, at *8-9 (no factors met despite shared yard, office space, telephone and fax number); *N. Kofsky*, 2015 WL 59173, at *10 ("separate leases for [a] shared office space" insufficient).

Finally, Plaintiffs allege that 16 people who once worked for Navillus also worked at some other point in time for Time Square or HDK Construction, LLC, a separate entity owned by Kevin.  These allegations are wholly unremarkable given that thousands of employees have worked for Navillus and over a thousand employees have worked for HDK since 2012.  *Time Square*, 2008 WL 55116, at *6 (that former Navillus employees later joined Time Square did not establish alter ego); *N. Kofsky*, 2015 WL 59173, at *11 (1/3 of union employees later worked for non-union company, as did office personnel and management); *JJJ Concrete Corp.*, 2015 WL 790085, at *7-10 (no alter ego factors met where a dozen employees worked *interchangeably* between two entities).  Nor is it probative that Time Square and Navillus have utilized common institutions for professional services, such as accountants or attorneys.  *JJJ Concrete Corp.*, 2015 WL 790085, at *7-10 (shared accountant and suppliers did not establish any alter ego factors).

**4.    Time Square and Navillus Do Not Share Equipment**

Time Square and Navillus each own and rent their own equipment which they have never shared nor treated interchangeably.  Plaintiffs claim that Time Square's purchase of two vehicles

and $40,000 worth of scaffolding from Navillus warrants an alter ego finding.  But these purchases, at fair market value, are not only remarkably insignificant in the context of Navillus' and Time Square's operations, but also wholly insufficient to establish substantially identical equipment.  *A.W. Farrell*, 547 F. App'x at 21 (union company provided substantially all of non-union company's equipment "free of charge"; this did not support an alter ego finding where "the transfer was complete, i.e., the companies did not thereafter share the equipment."); *A&M Heating*, 314 F. Supp. 2d at 349; *N. Kofsky*, 2015 WL 59173, at *5.

**5.    Time Square and Navillus Do Not Have Substantially Identical Customers**

Time Square and Navillus do not have substantially identical customers.  The fact that Navillus on two instances nearly ten years ago was hired as a subcontractor by Time Square – creating union jobs and generating payments to the Plaintiffs' funds – is wholly antithetical to the notion that Time Square is somehow a scheme to avoid fund payments and entirely insignificant when compared with the volume of customers (100+) for whom Navillus has worked since 2011.  *N. Kofsky*, 2015 WL 59173, at *11 ("some overlap" in clients did not support alter ego finding); *Marino Elec.*, 285 NLRB at 344 (entities shared 50% of customers). Likewise, the fact that Time Square only bid on Sugar Hill after the general contractor told Navillus that it would not work with a union subcontractor only further demonstrates that Navillus and Time Square do not and cannot serve substantially identical clientele.  *JJJ Concrete Corp.*, 2015 WL 790085, at *8-10.

**6.    There is No Anti-Union Animus**

Finally, there is no evidence that Donal, a career-long union employer, has ever exhibited, much less taken any actions motivated by anti-union animus.  Nor is there evidence that Kevin, a former union tradesman himself, has any anti-union animus.

**Conclusion As To Navillus And Time Square**

Time Square is not the disguised continuance of Navillus. *Lihli Fashions*, 80 F.3d at 748.

Time Square was created over ten years ago with a wholly separate purpose from Navillus: to

serve as a general contractor on private, new development work, which Navillus does not do.

Nor was Time Square created as a sham transaction for the purpose of evading Navillus' union

obligations. *Id.* Navillus remains a growing and diversified construction company that

continues to perform concrete superstructure work and make substantial payments to the

Plaintiffs' funds. *Local No. 3*, 261 F.3d at 303. The alter ego factors, none of which are met

here, support this conclusion. Time Square and Navillus do not have substantially identical

management, business purposes, operations, equipment, customers, supervision, or ownership,

nor is there any evidence of anti-union animus. *Local No. 3*, 261 F.3d at 299.

Plaintiffs rely almost entirely on a single project performed by Time Square, the Sugar

Hill Project, on which Donal provided some initial assistance and three former Navillus

employees and one then-current Navillus employee worked as consultants. This is not sufficient

to establish any of the alter ego elements. *JJJ Concrete*, 2015 WL 790085, at *7-9 (no alter ego

factors present despite close family connections and mutual presence in the concrete business

serving divergent clients, evidence of interchange of employees, and various shared operations);

*A.W. Farrell*, 2012 WL 4092598, at *10-15 (no alter ego despite close family connections,

weekly meetings between management to provide advice; manager of union company

represented non-union company to outside interests; other indicia of overlap not present here).

Moreover, Time Square's isolated foray into concrete subcontracting on a single project

is insufficient to establish substantially identical business purposes, which cuts strongly against

an alter ego finding. *A.W. Farrell*, 2012 WL 4092598, at *14-15; *JJJ Concrete*, 2015 WL

790085, at *7-9; *Lihli Fashions*, 80 F.3d at 743 (common ownership and control outweighed by

13

distinct business purpose despite performing related function in same industry); *Armen Digital*, 1997 WL 458738 (shared offices, equipment, customers; close family relationship, but different (although related) business purpose); *Express Servs.*, Inc., 426 F.3d at 640 (allegations that the alleged alter egos shared common mailing address and management were not sufficient where the entities engaged in "different, though related lines of business" and no record of shared customer base or equipment); *Local No. 3*, 261 F.3d at 302-03.  Accordingly, Plaintiffs have not established that Time Square and Navillus are alter egos.

        **B.**        **ACS is Not the Alter Ego of Navillus.**

        ACS is not the alter ego or disguised continuance of Navillus.  While both ACS and Navillus perform work as concrete subcontractors, the similarities end there.  The fact that Navillus continues to operate as a viable and thriving concrete subcontractor demonstrates that ACS and Navillus operate in different markets and that ACS is not the disguised continuance of even a subset of Navillus' business.  In this light, the assistance provided by Donal and/or Navillus to ACS during its formative period, on which Plaintiffs exclusively rely, is particularly insignificant.  Indeed, the NLRB and courts have consistently recognized that such "start-up" assistance is not germane to the alter ego analysis particularly where, as here, the union entity survives as a thriving, ongoing operation wholly separate from the alleged alter ego.  *See Blue & White Cabs*, 291 NLRB 1047 (1988) ("to restrict consideration of the alter ego issue to Service's formation would distort the…essential identity and purpose."); *Marino Elec.,* 285 NLRB at 355 ("assistance in the formative stage is not determinative"); *L&J Equipment*, 274 NLRB 20, 28 (1985) (fact that alleged alter ego "benefited in its formative period" from connections with former employer not sufficient); *A. W. Farrell*, 2012 WL 4092598, at *14 ("business advice and operational support" during "early stages" could not sustain alter ego finding); *see also Local No. 3*, 261 F.3d at 303 (alter ego "usually comes into play when a new legal entity has replaced the

predecessor (or at least the unionized portion of the predecessor).")  (internal quotation marks omitted).  Moreover, even if the Court were to find that ACS was ever Navillus' alter ego (it was not), such a finding could only apply to the time period for which the Court finds the factors met. *Bd. of Trustees of Plumbers, Pipefitters & Mech. Equip. Serv., Local Union No. 392 Pension Fund v. Humbert*, 2017 WL 1177505, at *6 (S.D. Ohio Mar. 30, 2017) (finding that companies disentangled and ceased to be alter egos).

### 1.   ACS and Navillus Do Not Have Substantially Identical Management, Supervision, or Ownership

As stated above, Donal is the 100% owner of Navillus and wholly responsible for Navillus' management and day-to-day operations.  Moriarty and O'Donnell (and, until 2015, Hazel Corcoran) are the sole owners of ACS and are responsible for ACS's management and day-to-day operations.  Downes was briefly the owner of ACS during its first few months of existence.  Donal has never owned ACS.  Neither Moriarty, O'Donnell, Corcoran, nor Downes has ever owned Navillus.

Plaintiffs will argue that Donal's interest-bearing short-term loans to Moriarty during ACS's formative months and his holding of options to purchase ACS warrant an alter ego finding.  But neither establishes that Donal ever owned ACS, much less comes close to establishing substantially identical ownership.  *A.W. Farrell*, 2012 WL 4092598 at *13 (start-up assistance, including gifting the money to purchase alleged alter ego, did not create substantially identical ownership); *Armen Digital*, 1997 WL 458738, at *5, *8 (loans with no obligation to repay); *N.Y. State Teamsters Conference Pension & Ret. Fund ex rel. Bulgaro v. Doren Ave. Assocs., Inc. ("Doren Ave.")*, 321 F. Supp. 2d 435, 449 (N.D.N.Y. 2004), (priority right in liquidation proceeds, right of first refusal in any attempted sale) *aff'd sub nom.* 426 F.3d 640 (2d Cir. 2005).

Plaintiffs will also make much of the fact that Moriarty sought advice from Donal regarding employee compensation and, on a single occasion, asked for assistance with respect to a dispute between ACS and Mountco regarding Boston Road. But again, it is wholly unremarkable that Moriarty sought assistance and advice from his friend and former mentor, much less sufficient to establish common management or supervision. *A.W. Farrell*, 2012 WL 4092598 at *7, 13 (union shop manager spoke for non-union shop in resolution of a dispute, held weekly meetings with non-union management during start-up phase); *Armen Digital*, 1997 WL 458738, at *9 (owner of one company represented self as "president" and "in charge" of the other, shared check-signing authority); *Finkel*, 2008 WL 2630297, at *13 (consultation "insufficient to sustain Plaintiff's burden of proving common ownership and management").

Finally, Plaintiffs cannot establish substantially identical management or supervision merely because ACS's owners and certain managers previously held positions at Navillus. *Canada Dry*, 2000 WL 1886616, at *4 ("mere transfer of low and middle managers does not establish an identity in the management"); *Armen Digital*, 1997 WL 458738, at *9. Nor is it significant that Downes reviewed bids for his friends and former colleagues. *JJJ Concrete*, 2015 WL 790085, at *8-9 (no factors met even though union company's estimator performed services for alleged alter ego); *A.W. Farrell*, 2012 WL 4092598, at *10 (union company salesman responsible for 50% of non-union company sales).

### 2.   ACS and Navillus Do Not Have Substantially Identical Business Purposes

ACS and Navillus have separate business purposes. *Local No. 3*, 261 F.3d at 299, 301. Navillus is a union construction company engaged in multiple types of subcontracting work on union and prevailing wage jobs and as a prime or general contractor on publicly funded restoration jobs where it self-performs the majority of the work. ACS exclusively performs

concrete foundation and superstructure work on non-union and open shop jobs. *Express Servs.*, 426 F.3d at 650 (different business purposes where companies "engaged in different, though related, lines of business within the freight transportation industry"); *A.W. Farrell*, 2012 WL 4092598, at *14-15 (union contractor "derives a substantial portion of its income from . . . contracts subject to prevailing wage requirements," which the non-union contractor did not); *Marino Elec.*, 285 N.L.R.B. at 354-55 (electrical contractors had different business purposes because union and non-union status forced them to bid on different work); *JJJ Concrete*, 2015 WL 790085, at *10 (while "both Defendants may lay concrete, that is where the similarity ends"; "Defendants do not compete against each other because they do not … cater to the same clients"); *N. Kofsky*, 2015 WL 59173, at *10 (both companies performed plumbing work, but union entity performed various other trades).

Once again, the fact that ACS and Navillus both operate in the construction industry does not establish substantially identical business purposes. *Express Servs.*, 426 F.3d at 650; *Local No. 3*, 261 F.3d at 299, 301. Unlike Navillus, ACS does not perform masonry, tile, stonework, or any of the other trades Navillus performs besides concrete work. Nor does ACS serve as a prime or general contractor. Even when Navillus and ACS both perform concrete work, they operate in separate markets, as is further evidenced by the fact that both entities are ongoing, viable entities serving different customer bases. *Local No. 3*, 261 F.3d at 299-300; *Armen Digital*, 1997 WL 458738, at *8; *Marino Elec.*, 285 N.L.R.B. at 354-55; *JJJ Concrete*, 2015 WL 790085, at *10. Simply put, ACS does not take Navillus' work because Navillus and ACS cannot meaningfully compete for the same work. *JJJ Concrete Corp.*, 2015 WL 790085, at *10.

### 3.    ACS and Navillus Do Not Have Substantially Identical Operations

ACS and Navillus have wholly separate operations, each with their own substantial overhead. They have separate offices and facilities. *A&M Heating*, 314 F. Supp. 2d at 349.

They have their own telephone and computer systems, separate employees, their own support staffs, and separate payroll and business systems.  Each company files their own taxes and maintains separate financial statements, insurance policies, and bank accounts.  *N. Kofsky*, 2015 WL 59173, at *10; *JJJ Concrete*, 2015 WL 790085, at *9.

Nonetheless, Plaintiffs will argue that ACS and Navillus have common operations because they once had facilities on the same street in Queens.  However, mere physical proximity can hardly establish substantially identical operations, particularly where, as here, the facilities were separate and operated under separate leases.  *Kan Klean*, 1996 U.S. Dist. LEXIS 11295, at *21 (adjacent offices did not support alter ego finding); *N. Kofsky*, 2015 WL 59173, at *10 (no common operations despite "separate leases for [a] shared office space"); *A.W. Farrell*, 2012 WL 4092598 at *13 (rent-free use of facility not material); *Armen Digital*, 1997 WL 458738, at *7, *9 (shared offices); *JJJ Concrete*, 2015 WL 790085, at *7-10 (shared yard, office but no alter ego factors met).

Plaintiffs will also argue that ACS and Navillus are alter egos because Moriarty briefly used the address of a former Navillus colleague in an apartment that belonged to Donal's wife.  But this hardly establishes substantially identical operations.  *Doren Ave.*, 321 F. Supp. 2d at 449 (listing union entity address on documents not relevant where actual place of business was elsewhere).  Nor does Moriarty's alleged use of Navillus resources while employed by Navillus – unknown to Donal prior to this litigation – evidence any material overlap between the companies.  Indeed, the NLRB has specifically found it wholly unremarkable that an employee of a union entity derived benefits from that relationship when starting his own company.  *L&J Equipment*, 274 NLRB at 28 (founder of alleged alter ego continued to work for previous company during formative stage, used its address and phone number, numerous other "benefit[s]

in its formative period," did not establish alter ego); *A.W. Farrell*, 2012 WL 4092598 at *10-15

("start-up" assistance, including gifting of equipment, use of property, advice, etc.); *Doren Ave.*,

321 F. Supp. 2d at 449.

Finally, Plaintiffs allege that there are 27 individuals who at one time worked for

Navillus and, at some other point in time, worked for ACS.  But this is hardly noteworthy given

that Navillus has employed thousands of employees since ACS's founding and ACS issued over

800 W2s in 2014 alone.  *N. Kofsky*, 2015 WL 59173, at *11 (1/3 of union employees also

worked for non-union company); *JJJ Concrete*, 2015 WL 790085, at *8-9 (no factors met even

though companies shared a dozen employees).  Nor is it probative that ACS and Navillus have

utilized common professional services institutions.  *JJJ Concrete*, 2015 WL 790085, at *7-10; *N.*

*Kofsky*, 2015 WL 59173, at *11.

### 4.    ACS and Navillus Do Not Have Substantially Identical Equipment

Navillus and ACS each buy, rent, and use millions of dollars worth of equipment, which

they do not share or treat interchangeably.  Plaintiffs will claim that, because ACS leased a crane

for market value from Manhattan Tool, an entity owned by Donal with hundreds of other clients,

ACS and Navillus have substantially identical equipment.  Plaintiffs' position is clearly

untenable.  *A.W. Farrell*, 547 F. App'x at 21 (union company gifted all of non-union company's

equipment); *Marino Elec.*, 285 N.L.R.B. at 353-54; *A&M Heating*, 314 F. Supp. 2d at 349; *N.*

*Kofsky*, 2015 WL 59173, at *5.  Likewise, the isolated incident in which an ACS employee took

some concrete forms from Navillus' yard without permission is insignificant in this context.  *Id.*

### 5.    ACS and Navillus Do Not Have Substantially Identical Customers

ACS and Navillus have performed work for a single common customer, which is not

nearly sufficient to establish substantially identical customers and further undermines any notion

that ACS and Navillus operate in the same market.  *N. Kofsky*, 2015 WL 59173, at *11 ("some

19

overlap" did not support alter ego finding); *Marino Elec.*, 285 NLRB 344 (1987) (entities shared roughly 50% of customers); *JJJ Concrete*, 2015 WL 790085, at \*8-9.

### 6.    There is No Anti-Union Animus

There is no evidence of anti-union animus on the part of Donal.  Nor is the fact that Moriarty established his own, non-union construction company evidence of anti-union animus. *Marino Elec.*, 285 NLRB 344 (1987).

### Conclusion As To Navillus And ACS

ACS and Navillus are not alter egos.  ACS was not Navillus' "disguised continuance" or a sham transaction.  *Lihli Fashions*, 80 F.3d at 748.  Navillus remains a growing and diversified construction company that continues to perform concrete superstructure work and make substantial payments to Plaintiffs' funds.  *Local No. 3*, 261 F.3d at 303.  ACS did not subsume Navillus' concrete operation, nor did it assume Navillus' customer base or contracts.  *Kan Klean*, 1996 U.S. Dist. LEXIS 11295, at \*21.  Analysis of the alter ego factors supports this conclusion. None of the alter ego factors is met.  ACS and Navillus have never had substantially identical management, business purpose, operations, equipment, customers, supervision, or ownership, nor is there any evidence of anti-union animus.  *Local No. 3*, 261 F.3d at 299.

Rather than establish that any of the alter ego factors is met, Plaintiffs concoct a conspiracy theory that Donal secretly controlled ACS.  But the limited evidence of assistance from Donal and/or Navillus to Moriarty during ACS's formative months is neither material nor sufficient to satisfy Plaintiffs' burden of proof.  *A.W. Farrell*, 2012 WL 4092598, at \*10-15 (owner and manager of union company provided the funds to buy non-union company, provided free equipment, free facilities, operational services, workers; procured jobs and represented non-union company to third-parties); *L&J Equipment*, 274 NLRB at 28 (no alter ego finding where alleged alter ego obtained funds from union company, used its address and phone number during

"initial phases", benefited from no-fee leases, insurance, co-indemnification of bonds; owner of non-union company continued to work for union company while starting his own company).  For that matter, the limited assistance provided by Donal and/or Navillus does not suffice to establish any of the alter ego factors regardless of when ACS was founded.  *See* Section V.B.1-6, *supra*; *see also JJJ Concrete*, 2015 WL 790085, at *7-9 (no factors present between concrete companies despite evidence of interchange of employees, use of a shared yard and office and use of a common estimator, telephone, and fax machine); *Marino Elec.*, 285 NLRB 344 (despite common ownership and control, shared administrative services, informal transactions for equipment and office space, and overlap in customers, double-breasted operation sufficiently separate).

Accordingly, as with Time Square, Plaintiffs cannot establish that any substantial identity between ACS and Navillus with respect to any of the alter ego factors and judgment for Defendants is appropriate.

### C.    Post-Discovery Evidence

For the purposes of correctly determining whether ACS is an alter ego of Navillus, and, if so, the appropriate measure of damages, facts subsequent to the close of discovery must be considered.  Plaintiffs' claim they are entitled to damages resulting from projects performed by ACS as recently as this year.  While Plaintiffs' claims are without merit, because Plaintiffs bear the burden of proof with regard to liability, any damages that in theory could be awarded to Plaintiffs must be limited to the time period for which they can actually demonstrate an alter ego relationship between Navillus and ACS.  *Humbert*, 2017 WL 1177505, at *6 (limiting alter ego finding to period of entanglement).  Plaintiffs cannot have it both ways – they cannot claim entitlement to damages for a period of time for which they seek to preclude evidence.  *United States v. Sci. Applications Int'l Corp.*, 301 F.R.D. 1, 4 (D.D.C. 2013) (plaintiff's burden to prove damages; defendant entitled to evidence relevant to post-discovery damages).

Over two years after briefing summary judgment, Navillus continues to be a thriving construction company with a successful union concrete subcontracting business.  ACS remains completely separate and has grown into a thriving business in the non-union concrete market. Whatever limited assistance Donal and/or Navillus provided to ACS in its formative period was brief, insubstantial and lawful.  Significantly, it had no effect on the viability or growth and continued success of Navillus as a union represented company.  *A. W. Farrell*, 2012 U.S. Dist. LEXIS 128483 at *37 ("limited business advice and operational support" given during "early stages" and transfer of "vehicles, equipment and materials . . . to facilitate start-up and initial operations" not sufficient to sustain alter ego finding).

Plaintiffs' case is built almost entirely on allegations regarding two discreet projects occurring predominantly in 2012 and 2013.  Apparently Plaintiffs believe that if this Court should find that alter ego relationships existed as a result of projects completed three to four years ago, the Court must find that such relationships necessarily continued for years into the future.  Moreover, Plaintiffs evidently believe that the Court should make such a finding without any evidence of facts during this expanded period.  The fact that Plaintiffs do not want the Court to know anything about Defendants' continued separateness – through perfectly standard business records Plaintiffs will have had for nearly four months prior to trial and with still nearly a month before trial – underscores their effort to both expand the scope of their supposed damages and deny Defendants the right to counter with evidence that belies their claim.  Simply put, Plaintiffs are not prejudiced by the introduction of post-discovery evidence – *see EMI Music Mktg. v. Avatar Records, Inc.*, 334 F. Supp. 2d 442, 445-46 (S.D.N.Y. 2004) (no prejudice where plaintiffs had over two months to review new evidence before trial) – but by the facts and the law that firmly establish both that Plaintiffs' claims are meritless and that they certainly are not

entitled to damages *ad infinitum*.  To the contrary, Defendants will be clearly prejudiced by the preclusion of such evidence.  *Sci. Applications Int'l Corp.*, 301 F.R.D. at 3.

### D.      Individual Liability Claims

Because neither ACS nor Time Square is an alter ego of Navillus, *see* Sections V.A-B, *supra*, neither Donal nor Helen O'Sullivan ("Helen") can be held individually liable for any alleged non-payment resulting from work by ACS or Time Square.  *A.W. Farrell*, 2012 WL 4092598, at *17.  Nonetheless, even if either ACS or Time Square were found to be an alter ego of Navillus, Plaintiffs have not met their burden of establishing that individual liability is appropriate.  *See Trustees of Plumbers & Pipefitters Nat. Pension Fund v. De-Con Mech. Contractors, Inc.*, 896 F. Supp. 342 (S.D.N.Y. 1995) (alter ego showing insufficient to establish individual liability).  "[A]n individual is not liable for corporate ERISA obligations solely by virtue of his role as an officer, shareholder, or manager."  *Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir. 1993), *cert. denied*, 508 U.S. 973 (1993).  Rather, a plaintiff must prove "special circumstances" such as a fraud related to non-payment.  *Id.*; *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo ("Lollo I")*, 35 F.3d 29, 35 (2d Cir. 1994).  Courts apply a two-step analysis to determine whether an individual defendant should be held personally liable for fraudulent conduct.  *First*, the court must determine whether the individual is a "controlling corporate official."  *Lollo I*, 35 F.3d at 33.  *Second*, the court must determine whether the elements of fraud are met with respect to the alleged nonpayment.  *Lollo I*, 35 F.3d at 33.

### 1.      The Controlling Corporate Official Prong is Not Met

A determination that an individual is a "controlling corporate official" involves examining the "officer's actual role in the company's affairs and relationship to the company's wrongdoing."  *Lollo I*, 35 F.3d at 33.  An individual is not a "controlling corporate official" merely because of his "dominant role in the affairs of a corporate employer."  *Sasso*, 985 F.2d at

51.  Rather, courts require a clear and direct showing that the individual was personally involved in the alleged fraud.  *See Lollo I*, 35 F.3d at 33.

Although Donal is the President and owner of Navillus, he has no personal involvement in any alleged "wrongdoing" against the pension funds.  *Lollo I*, 35 F.3d at 33.  Donal does not have operational control over Navillus' ERISA contributions, nor is he responsible for preparing and signing remittance reports.  *Lollo I*, 35 F. 3d at 33.  Navillus has a department dedicated to payroll and ensuring checks and remittance reports are properly issued.  Moreover, Donal is not the owner of Time Square or ACS.  Donal has no involvement in the operations of either of those companies.  As a result, Donal has no involvement in the alleged wrongdoing.

Meanwhile, Helen has no operational or managerial control over Navillus.  She has no dominant or decision making authority with respect any of Navillus' business decisions, not to mention Navillus' pension fund contributions.  *See Lollo I*, 35 F.3d at 33.  Additionally, Helen has no personal relationship to the alleged wrongdoing.  Simply signing remittance reports and overseeing Navillus' payroll is not sufficient.  Indeed, Plaintiffs admit that Navillus has not underpaid pension funds with respect to Navillus employees.

## 2.    The Pension Funds Were Not Defrauded

To establish fraud, Plaintiffs must show the individual (1) made a material false representation or omission of fact, (2) with knowledge of its falsity and intent to defraud, (3) on which plaintiffs reasonably relied, and (4) were damaged as a result.  *Lollo I*, 35 F.3d at 33.

Mere allegations intended to support alter ego findings are not sufficient to establish a material misrepresentation or clear intent to defraud.  *See Lollo I*, 35 F.3d at 34; *De-Con Mech. Contractors, Inc.*, 896 F. Supp. at 342.  Plaintiffs can point to no material misrepresentation, much less any intent to defraud.  Instead, Plaintiffs claim that Navillus omitted payments on account of work performed by Time Square and ACS.  However, Time Square and ACS have at

24

all times been separate entities from Navillus and not parties to any collective bargaining agreement.  Plaintiffs cannot bootstrap their individual liability claims merely by claiming Navillus should have made payments on account of work performed by these entities without any evidence of any deliberate attempt to defraud the funds.

To establish reliance, Plaintiffs must show that they themselves reasonably relied on material misrepresentations.  *Lollo II*, 148 F.3d 194, 196 (2d Cir. 1998).  Plaintiffs could not have reasonably relied on any "assurances of separate ownership" where, as here, they have engaged in a relentless corporate campaign against both Time Square and ACS since each entity's formation.  Likewise, Plaintiffs have suffered no damages.  None of the Time Square or ACS jobs consisted of work that could have been done by unionized workers at Navillus because Navillus operates in a different market than Time Square or ACS.  Navillus could not compete on the jobs won by Time Square and ACS, as evidenced by the fact that Navillus' bid for the Sugar Hill job was squarely rejected simply because Navillus was an union contractor.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs cannot meet their burden of establishing that either Time Square or ACS is the alter ego of Navillus or that individual liability is appropriate with respect to Donal or Helen.

Dated: July 7, 2017

Jones Day

By: s/ *Willis J. Goldsmith*

Willis J. Goldsmith
Lee A. Armstrong
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
wgoldsmith@jonesday.com
laarmstrong@jonesday.com

Attorneys for Defendants Navillus Tile, Inc.,
Donal O'Sullivan, and Helen O'Sullivan