**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Terrence Moore,** *et al.,* | |
| **Plaintiffs,** | **14-CV-8326 (CM)(JLC)** |
| **-against-** | |
| **Navillus Tile, Inc., d/b/a Navillus Contracting,** *et al.,* | |
| **Defendants.** | |
| **Thomas Gesualdi,** *et al.,* | |
| **Plaintiffs,** | **15-CV-08441 (CM)(JLC)** |
| **-against-** | |
| **Navillus Tile, Inc., d/b/a Navillus Contracting,** *et al.* | |
| **Defendants.** | |

**NAVILLUS DEFENDANTS' PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**Page**

I.    NAVILLUS DEFENDANTS' PROPOSED FINDINGS OF FACT ............................... 1

    A.    The Parties ............................................................................................. 1

    B.    Findings of Fact as to Navillus, Donal O'Sullivan, and Helen O'Sullivan .......... 2

        (a)    Navillus' Pension Fund Contributions ...................................................... 2

        (b)    Navillus' Management, Supervision, and Ownership ............................. 4

        (c)    Navillus' Business ................................................................................... 5

        (d)    Navillus' Operations ............................................................................... 7

        (e)    Navillus' Equipment, Vendors, and Customers ........................................ 8

        (f)    The Corporate Campaign Against Navillus ............................................. 8

    C.    Navillus and Time Square Are Separate, Significant Economic Entities ............ 9

        (a)    The Sugar Hill Project ........................................................................... 11

    D.    ACS and Navillus are Separate, Significant Economic Entities ........................ 12

        (a)    Moriarty Creates TMG .......................................................................... 14

        (b)    Moriarty Creates ACS ........................................................................... 16

        (c)    Donal's Limited Startup Assistance to Moriarty .................................... 17

        (d)    Donal's Limited Involvement in the Boston Road Contract ................... 18

        (e)    Navillus Had No Involvement In Other ACS Contracts ......................... 19

    E.    Findings of Fact Regarding Plaintiffs' Damages Claims .................................... 20

II. NAVILLUS DEFENDANTS' PROPOSED CONCLUSIONS OF LAW ............................ 21

    A.    Use of Post-Discovery Evidence is Essential and Not Prejudicial .................... 21

    B.    Neither Time Square Nor ACS is Navillus' Alter Ego ....................................... 22

        (a)    Legal Standard ....................................................................................... 22

    C.    Time Square is Not the Alter Ego of Navillus .................................................... 25

        (a)    Time Square and Navillus Do Not Have Substantially Identical
                Management, Supervision, and Ownership ............................................ 27

        (b)    Time Square and Navillus Do Not Have Substantially Identical
                Business Purposes ................................................................................... 29

        (c)    Time Square and Navillus Do Not Have Substantially Identical
                Operations ............................................................................................... 31

        (d)    Time Square and Navillus Do Not Have Substantially Identical
                Equipment ............................................................................................... 33

## TABLE OF CONTENTS

**Page**

(e)     Time Square and Navillus Do Not Have Substantially Identical Customers ................................................................. 33

(f)     There is No Evidence of Anti-Union Animus ......................................... 34

(g)     Totality of the Factors Preclude Alter Ego Finding................................ 34

D.     ACS is Not the Alter Ego of Navillus.................................................................... 36

(a)     ACS and Navillus Do Not Have Substantially Identical Management, Supervision, or Ownership................................................. 37

(b)     ACS and Navillus Do Not Have Substantially Identical Business Purposes ................................................................................................ 39

(c)     ACS and Navillus Do Not Have Substantially Identical Operations....... 40

(d)     ACS and Navillus Do Not Share Substantially Identical Equipment ...... 42

(e)     ACS and Navillus Do Not Have Substantially Identical Customers ....... 42

(f)     There is No Evidence of Anti-Union Animus ......................................... 42

(g)     Totality of the Factors Preclude Alter Ego Finding................................ 43

E.     There Can be No Individual Liability for ERISA Fraud ...................................... 45

(a)     The Controlling Corporate Official Prong is Not Met............................ 47

(b)     The Pension Funds Were Not Defrauded ............................................... 48

Pursuant to Part VI(F) of the Court's Individual Practices and Procedures, corporate defendant Navillus Tile, Inc., d/b/a Navillus Contracting ("Navillus"), and individual defendants Donal O'Sullivan ("Donal") and Helen O'Sullivan ("Helen" and, with Navillus and Donal, collectively the "Defendants"), hereby submit their proposed findings of fact and conclusions of law in advance of the Final Pretrial Conference.

## I.  NAVILLUS DEFENDANTS' PROPOSED FINDINGS OF FACT

### A.  The Parties

1.    The Plaintiffs are trustees and fiduciaries of the following five different groups of multi-employer benefit pension, welfare, vacation, apprenticeship and scholarship funds: Local 46 Funds, Cement Workers Funds, Local 780 Funds, Carpenters Funds, and Local 282 Funds (collectively, the "Plaintiffs").

2.     Navillus is a New York corporation with offices at 633 Third Avenue, New York, NY 10017.  Navillus is one of the largest unionized subcontractors in New York, serving primarily as a subcontractor doing masonry, concrete, stone, tile, steel, restoration, repointing, roofing, carpentry, electrical, plastering, and fireproofing work on large union construction projects.

3.    Advanced Contracting Solutions, LLC, d/b/a ACS LLC NY ("ACS") is a Delaware limited liability corporation, authorized to do business in New York as a foreign corporation under the name ACS NY LLC.  ACS is an open shop concrete subcontractor that exclusively performs concrete foundation and superstructure work.

4.    Time Square Construction, Inc. ("Time Square") is a New York corporation with offices at 355 Lexington Avenue, New York, NY 10017.  Time Square is a general contractor

focused on the construction and development of new luxury residential, commercial, mixed-use high-rise and mid-rise developments.

5.      HDK Construction, LLC ("HDK") is a foreign Delaware corporation authorized to do business in the State of New York, maintaining its principal offices for doing business at 355 Lexington Avenue, New York, New York 10017.

6.      Donal is the sole owner and President of Navillus.

7.      Kevin O'Sullivan ("Kevin") is the CEO, President and sole owner of Time Square and of HDK.

8.      Helen is Donal's sister and an employee at Navillus.  Helen is responsible for Navillus' payroll.  Helen has never had an ownership interest in or control over the company.

**B.      Findings of Fact as to Navillus, Donal O'Sullivan, and Helen O'Sullivan**

**(a)      *Navillus' Pension Fund Contributions***

9.      Navillus was formed in 1987 as a small tile business by brothers Donal, Kevin, and Leonard O'Sullivan.  Navillus has since grown into one of the largest union construction firms in New York City, which it remains to this day.  (D. O'Sullivan Testimony)

10.      Navillus has been a union employer since it hired its first employees in 1989 and is now one of the biggest contributors to Taft-Hartley benefit funds in New York City. (D. O'Sullivan Testimony)

11.      Navillus paid over $172 million in contributions to benefit funds from calendar years 2011 through 2016, including over $83 million to the Plaintiffs during that time period and over $19 million to Plaintiffs alone in 2016.  (D. O'Sullivan Testimony; P. Naughton Testimony; DX 36)  Navillus contributed more than $34 million to all union funds in 2016. (P. Naughton Testimony)

12.     Since the creation of Time Square in 2006 and ACS in 2013, Navillus' business has continued to grow, with a roughly 65% increase in audited revenues between fiscal year 2011 and fiscal year 2016.  (D. O'Sullivan Testimony)

13.     In 2016 alone, Navillus employed over 1,600 union workers and is a party to agreements with the following unions:

(a)     Bricklayers and Allied Craftworkers, Local 1;

(b)     Bricklayers and Allied Craftworkers, Local 7 (formerly Marble Carvers, Cutters & Setters Union of NY & NJ, Local 4; Marble Finishers Union of NY, Local 20; Tile Setters Union of NY & NJ, Local 52; and Tile Finishers of NY, Local 88).

(c)     NYC District Council of Carpenters, Locals 157 and 1556;

(d)     Laborers International Union of North America ("LIUNA") Cement & Concrete Workers of New York City (Laborers' Locals 6A, 18A, and 20 Concrete Workers);

(e)     Cement Masons, Local 780;

(f)     International Union of Operating Engineers, Locals 13, 15, 138;

(g)     LIUNA Local 731 (Excavators);

(h)     LIUNA (Laborers) Local 66;

(i)     LIUNA Construction and General Building Laborers' (Mason Tenders) Local 79;

(j)     Metallic Lathers and Reinforcing Ironworkers, Local 46;

(k)     Plasterers, Locals 1 and 262;

(l)     Pointers, Local 1;

(m)     Ironworkers Local 197 Stone Derrickmen & Riggers;

(n)     Stone Setter, Local 1;

(o)     Teamsters, Local 282;

(p)     LIUNA Laborers Local 1010 (Pavers);

(q)     Ironworkers, Local 580; and

**(r)**      Locals 14, 15, 15A, and 15D (Operating Engineers and Surveyors)

(D. O'Sullivan Testimony; P. Naughton Testimony)

14.      Navillus' concrete-related business has also continued to grow, and Navillus' contributions to the Plaintiffs have increased over 150% from 2011 to 2016.  (D. O'Sullivan Testimony; P. Naughton Testimony)

15.      The following chart depicts Navillus' fund contributions to the Plaintiffs and all union funds since 2011:

| Union | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total paid |
|---|---|---|---|---|---|---|---|
| Carpenters – Local 157, 1556 | $3,675,180.80 | $4,888,682.46 | $5,571,935.60 | $3,958,559.78 | $10,706,323.47 | $6,349,703.06 | $35,150,385.17 |
| Cement & Concrete Laborers | $2,458,223.07 | $4,147,155.07 | $5,711,150.00 | $3,574,736.79 | $7,141,343.80 | $7,475,593.85 | $28,935,656.44 |
| Cement Masons – Local 780 | $408,663.14 | $213,877.75 | $548,820.72 | $632,668.71 | $1,188,423.17 | $1,872,923.12 | $4,865,376.61 |
| Metal Lathers - Local 46 | $699,114.21 | $1,680,908.78 | $2,661,968.03 | $985,349.16 | $4,687,942.43 | 2,894,102.42 | $12,709,710.08 |
| Teamsters – Local 282 | $207,592.95 | $312,473.82 | $278,286.35 | $161,040.91 | $199,088.96 | $433,244.86 | $1,591,727.85 |
| Total (Plaintiff Funds) | $7,448,774.17 | $11,243,097.88 | $14,772,160.70 | $9,312,355.35 | $23,923,121.83 | $19,025,567.31 | $83,252,856.15 |
| Total (All Union Funds) | $24,732,143.80 | $22,880,231.63 | $29,332,580.54 | $21,429,527.78 | $36,662,892.27 | $34,957,322.80 | $172,579,176.91 |

(D. O'Sullivan Testimony; P. Naughton Testimony; DX 36)

**(b)**      *Navillus' Management, Supervision, and Ownership*

16.      In 1998, when Leonard O'Sullivan left Navillus, Donal and Kevin each assumed 50% ownership of the company.  (D. O'Sullivan Testimony)

17.      Kevin  served as Vice President of Navillus until he resigned in 2006.  Since then, Navillus has been under Donal's exclusive management.  (D. O'Sullivan Testimony)

18.      Donal is also the sole owner of Navillus and has been since January 2015, when Kevin sold Donal his 50% interest in Navillus. (D. O'Sullivan Testimony; DX 41)

19.     Since he resigned from Navillus in 2006, Kevin has played no part in the management, supervision, or direction of Navillus' business operations, nor has he had any input or discretion over Navillus' hiring practices, labor relations, or the terms and conditions of employment of Navillus employees.  (D. O'Sullivan Testimony)

20.     Currently, Navillus' board members are Donal, Peter Downes ("Downes") (Chief Estimator), Colin Mathers (Director of Operations), and Saleem Asmed (Vice President of Scaffolding Division).  (D. O'Sullivan Testimony)

21.     Padraig Naughton ("Naughton") is Navillus' Chief Financial Officer.  (D. O'Sullivan Testimony; P. Naughton Testimony)

22.     Helen has never owned any Navillus shares or been a director of the company. Her responsibilities at Navillus are limited to payroll administration and preparation of pension fund remittance reports.  (D. O'Sullivan Testimony; H. O'Sullivan Testimony)

23.     Although Eoin Moriarty ("Moriarty"), Patrick Corcoran, Hazelyn Corcoran ("Hazelyn"), John Kuefner ("Kuefner"), and Willie O'Donnell ("O'Donnell") all worked for Navillus, none has ever held any ownership interest in or been an officer of Navillus. (D. O'Sullivan Testimony)

**(c)     *Navillus' Business***

24.     Today, Navillus primarily serves as a subcontractor doing masonry, concrete, stone, tile, steel, restoration, repointing, roofing, carpentry, electrical, plastering, and fireproofing work on large union construction projects.  In total, subcontracting work accounted for over 83% of all Navillus revenues from calendar year 2011 through the end of 2016.  (D. O'Sullivan Testimony; DX 37)

25.     Navillus also performs many of these same trades as a prime or general contractor on small and large public restoration jobs (for government agencies and authorities) where

Navillus self-performs the majority of the work.  Navillus does not serve as a prime or general

contractor for private development.  (D. O'Sullivan Testimony; P. Downes Testimony)  In total,

general contracting work accounted for 17% of all Navillus revenues from calendar year 2011

through the end of 2016.  (D. O'Sullivan Testimony; DX 37)

      26.     Navillus is one of the largest masonry contractors in the City.  From calendar year

2011 through the end of 2016, masonry subcontracts accounted for about 18% of  revenues.

(D. O'Sullivan Testimony; DX 37)

      27.     Navillus' concrete subcontracting revenues are primarily derived from its work

building concrete superstructures, meaning concrete above the foundation level.  Navillus

performs almost no concrete foundation work, which involves the excavation and pouring of

concrete foundations.  Foundation work has accounted for only slightly over $1 million in

Navillus revenues since calendar year 2011, or about one tenth of one percent of Navillus

revenues.  (D. O'Sullivan Testimony; DX 37)

      28.     From calendar year 2011 through the end of 2016, concrete work accounted for

over 49% of all revenues.  Revenues from concrete work have grown from over $24 million in

calendar year 2011 to over $124 million in calendar year 2016.  Revenues from concrete work

grew from 16% in 2011 to roughly 60% in 2016.  (D. O'Sullivan Testimony; DX 37)

      29.     Navillus submits approximately 350-400 bids a year and is generally awarded 10-

15% of those bids.  Downes and his team handle the bids.  (P. Downes Testimony)

      30.     Because Navillus is a union shop, Navillus bids almost exclusively on projects

that seek only union contractors and prevailing wage jobs.  (P. Downes Testimony;

D. O'Sullivan Testimony; DX 37)

(d)     *Navillus' Operations*

31.     Since its founding, Navillus has steadily grown its workforce.  In 2015, Navillus

employed 2,127 individuals, an increase from the 1,515 employees Navillus employed in 2012.

Roughly 98% of Navillus employees in 2015 were union tradesmen and women.  (D. O'Sullivan

Testimony)

32.     As Plaintiffs' own records demonstrate, Navillus employed thousands of

employees from the unions whose members are the beneficiaries of the Plaintiffs in the years

leading up to this lawsuit.  (DX 143 to DX 147)

33.     Since 2015, Navillus has been headquartered at 633 Third Avenue, New York,

NY, where it leases 12,000 square feet.  Previously, Navillus' headquarters were located at 575

Fifth Avenue, New York, NY.  (D. O'Sullivan Testimony)  Navillus also leases space on First

Street in Queens and previously had yards on Review Avenue in Queens and in Sayreville, NJ.

For a couple of months in 2006, Time Square leased space from Navillus for market value.

Navillus has never shared its facilities, equipment, supplies, or employees at either of these

locations with Time Square, HDK, or ACS.  (D. O'Sullivan Testimony; P. Naughton Testimony)

34.     Navillus maintains its own telephone and computer systems.  (D. O'Sullivan

Testimony)

35.     Navillus maintains its own books and records, files its own taxes, and does not

comingle funds with any other entity.  (D. O'Sullivan Testimony; P. Naughton Testimony)

36.     Navillus does not share insurance policies, bank accounts, equipment, vehicles,

labor, human resources, payroll systems, or professional services with any other company, nor

does it pay for any other company's insurance policies, bank accounts, equipment, vehicles,

labor, payroll systems, or professional services. (D. O'Sullivan Testimony; P. Naughton

Testimony) Navillus does not pay for ACS or Time Square's legal fees or other expenses related to this lawsuit.  (D. O'Sullivan Testimony; P. Naughton Testimony)

### (e)    *Navillus' Equipment, Vendors, and Customers*

37.    Navillus owns millions of dollars worth of construction equipment including a fleet of over 23 vehicles.  Navillus also rents or leases a substantial amount of equipment from various rental companies depending on the needs of the company.  (D. O'Sullivan Testimony; P. Naughton Testimony; DX 39)

38.    From 2011 through 2016, Navillus made payments totaling over $280 million to more than 1,000 different vendors for the purchase or lease of equipment, materials, and services.  (D. O'Sullivan Testimony)  In 2016 alone, Navillus leased equipment from over 35 different companies, totaling over $3.5 million in lease contracts.

39.    One of Navillus' vendors is Manhattan Tool, an entity which Donal has owned since 2014 and which leases equipment to over 300 different construction companies in New York City.  (D. O'Sullivan Testimony)

40.    From 2011 through the end of 2016, Navillus received revenues from roughly 450 different jobs through contracts with over 100 different customers.  (D. O'Sullivan Testimony; DX 32)

### (f)    *The Corporate Campaign Against Navillus*

41.    For nearly ten years, Plaintiffs and their affiliate unions have waged a campaign of intimidation and pursued litigation against Navillus and the O'Sullivan brothers. (D. O'Sullivan Testimony)

42.    In 2007, the Mason Tenders filed a lawsuit alleging that Time Square and Navillus were alter egos or a single employer, making the same allegations that they make here.

The Southern District of New York found that Time Square was not Navillus' alter ego and that they were not a single employer.  (DX 141)

43.     Over the years, Plaintiffs frequently distributed fliers depicting Donal and Kevin as "pigs."  They circulated stickers asking, "Is Navillus going non-union?", and seeking anonymous tips.  (D. O'Sullivan Testimony; DX 152, DX 153)

44.     The Plaintiffs surveilled Navillus job sites, hired union salts to work undercover on Navillus jobs, to photograph employees at the job sites and to collect information on Navillus pay.  They engaged outside consultants to investigate Navillus, ACS and Time Square.  (D. O'Sullivan Testimony; W. Bravo Testimony; R. Silva Testimony; J. Makin Testimony; D. Hancock Testimony)

45.     At least one salt, Wilson Bravo, became a member of the Carpenters' union just after "salting" on the Boston Road job.  (W. Bravo Testimony)

### C.    Navillus and Time Square Are Separate, Significant Economic Entities

46.     Time Square has always been an independent business controlled solely by Kevin O'Sullivan ("Kevin").  (K. O'Sullivan Testimony; D. O'Sullivan Testimony)

47.     No one at Navillus has ever had any managerial or operational role at Time Square.  (K. O'Sullivan Testimony; D. O'Sullivan Testimony)  Although Time Square was originally owned by Donal and Kevin, Donal sold his 50% shares in April 2012.  Since then, Kevin has been the sole owner, officer and director of Time Square.

48.     Kevin is also the sole owner, officer and director of HDK.  HDK is a separate and independent company from Time Square.  (K. O'Sullivan Testimony; D. O'Sullivan Testimony; DX 40, DX 151, DX 161)

49.     No one at Navillus issues or has authority to issue checks for Time Square or HDK.  Navillus does not supply workers to Time Square or HDK.  (K. O'Sullivan Testimony; D. O'Sullivan Testimony)

50.     Since Kevin left Navillus to start Time Square, he has had no control at Navillus whatsoever.  (K. O'Sullivan Testimony; D. O'Sullivan Testimony)

51.     At no time has any Navillus employee been on the payroll of Navillus and Time Square at the same time.  (K. O'Sullivan Testimony)

52.     Of the over 1,000 HDK employees, one person, Moriarty, through his own consulting company, consulted for HDK while he was an employee of Navillus.  (K. O'Sullivan Testimony)

53.     Navillus does not share equipment or vendors with Time Square.  (K. O'Sullivan Testimony; D. O'Sullivan Testimony)  There have never been any informal leasing arrangements between Navillus and Time Square or HDK.  (K. O'Sullivan Testimony; D. O'Sullivan Testimony)

54.     Once, in its eleven year history, Navillus sold Time Square some equipment and materials and lent Time Square a Navillus truck so that Time Square could deliver those materials and equipment to the Time Square job site.  Record evidence shows Time Square paid for the equipment.  (K. O'Sullivan Testimony; P. Naughton Testimony; DX 42, 137, 168, 169)

55.     Navillus does not share common customers with Time Square.  Time Square's customers are owners/developers.  Navillus' customers are general contractors.  (K. O'Sullivan Testimony; D. O'Sullivan Testimony)

56.     Three years after Time Square was formed, the Southern District of New York, Hon. Shira A. Scheindlin, held that Time Square was not an alter ego, joint employer, single employer or double-breasted operation with Navillus ("Scheindlin Decision").  (DX 141)

### (a)     The Sugar Hill Project

57.     In early 2012, Navillus submitted a bid to general contractor Mountco Construction ("Mountco") for a concrete superstructure and foundation subcontract on the Sugar Hill job, a prevailing wage project in Harlem.  (D. O'Sullivan Testimony; P. Downes Testimony)

58.     In connection with Navillus' bid, Donal and Navillus' Chief Estimator Downes visited the Sugar Hill site and met with Joel Mounty ("Mounty"), the owner of Mountco, and other Mountco employees. (D. O'Sullivan Testimony; P. Downes Testimony)

59.     Mountco rejected Navillus' bid, claiming it was too expensive and explaining that Mountco had decided it would proceed on a non-union basis.  (D. O'Sullivan Testimony; P. Downes Testimony)

60.     Donal alerted Kevin to the opportunity at Sugar Hill after Navillus' bid was rejected.  Time Square ultimately bid and won the subcontract for the concrete work.  Neither Navillus nor Donal had anything to do with Mountco's decision to hire Time Square.  (D. O'Sullivan Testimony; P. Downes Testimony)

61.     Sugar Hill was a prevailing wage job, so Time Square had to pay the same benefits to employees as if it were a union job.  (K. O'Sullivan Testimony)  There was no attempt to avoid the obligations of a collective bargaining agreement.

62.     Donal made no financial gain from the Sugar Hill job.  (D. O'Sullivan Testimony)

63.     Donal had no involvement whatsoever in the actual day-to-day operations of the project.  His involvement was limited to giving brotherly advice to Kevin at the beginning of the

project and agreeing to review contract documents.  (D. O'Sullivan Testimony; K. O'Sullivan Testimony)

64.     Donal was contacted by Mounty regarding regulatory issues when Time Square was unresponsive to Mounty.  Mounty likely reached out to Donal because they had met in 2013 and Mounty needed another way to get in touch with Time Square; it was not because Donal had control over the Sugar Hill job.  (D. O'Sullivan Testimony; PX 155-160, 168, 176-194)

65.     In the summer of 2012, Kuefner, a Navillus employee, was working as Project Manager on a Navillus job nearing completion at 1717 Broadway.  That project finished in August 2012 and Kuefner, with no new project at Navillus, left to form his own consulting company, CCB Experts, LLC ("CCB Experts").  (J. Kuefner Testimony)

66.     To help Kuefner get work, Donal suggested that Kevin speak to Kuefner about working on the Sugar Hill job.  Kevin approached Kuefner to do consulting work for Time Square on Sugar Hill.  CCB Experts was ultimately hired to consult on Sugar Hill. (J. Kuefner Testimony)

67.     Two years later, Kuefner was called on to perform close out work on Sugar Hill. Although Kuefner was then an ACS employee, he performed the close out work because it was his responsibility as part of the original contract.  (J. Kuefner Testimony)

68.     In 2012, Kevin also asked Hazelyn to consult on Sugar Hill.  Hazelyn had not been an employee of Navillus since 2008.  (K. O'Sullivan Testimony)

**D.     <u>ACS and Navillus are Separate, Significant Economic Entities</u>**

69.     Neither Navillus nor Donal has ever owned ACS.  (D. O'Sullivan Testimony)

70.     Neither Navillus nor Donal has ever received any financial benefit from ACS's business.  (D. O'Sullivan Testimony)

71.     Neither Navillus nor Donal is privy to any of ACS's financial reports, books and records or statements.  (D. O'Sullivan Testimony)

72.     Donal knows nothing of ACS's gross revenue, profits, projects or business plans. (E. Moriarty Testimony; W. O'Donnell Testimony; D. O'Sullivan Testimony)

73.     ACS owns millions of dollars of its own equipment.  (E. Moriarty Testimony; J. Kuefner Testimony; W. O'Donnell Testimony; DX 103, DX 109)

74.     ACS files its own tax returns and maintains its own books and records.  It also has its own separate financial statements, bank accounts, insurance policies, equipment, vehicles, payroll systems, lawyers, vendors and customers.  Navillus and Donal have nothing to do with any of these matters.  (E. Moriarty Testimony; J. Kuefner Testimony; W. O'Donnell Testimony; D. O'Sullivan Testimony; DX 20-23; DX 28)

75.     ACS has never shared with Navillus any physical space, insurance policies, bank accounts, equipment, vehicles, labor, administrative functions, payroll or professional services. ACS does business with several vendors that also provide services to Navillus, such as Signature Bank and Construction Risk Partners, but that is simply the result of the personal relationships Moriarty established during his years at Navillus.  (E. Moriarty Testimony; J. Kuefner Testimony; W. O'Donnell Testimony; P. Naughton Testimony; D. O'Sullivan Testimony; DX 20-23; 28; 89)

76.     ACS and Navillus have had one common customer:  the developer CNY. Navillus has had hundreds of other customers.  (D. O'Sullivan; E. Moriarty Testimony)

77.     Plaintiffs identified eight common vendors between ACS and Navillus.  Some of these vendors, for example, Stillwell and NYCON, are widely used by contractors throughout the City.  (E. Moriarty Testimony; J. Kuefner Testimony; W. O'Donnell Testimony; DX 89)

78.     Donal has never had any involvement in ACS's core business and operational decisions such as who to hire, fire, and promote, what projects ACS should bid on, how projects should be staffed and supervised, what equipment it should purchase, what materials are needed for various jobs, how to manage payroll and benefits.  (E. Moriarty Testimony; D. O'Sullivan Testimony)

79.     Specifically, ACS's owners have always had complete authority over the compensation and benefits of their employees.  Aside from a single occasion in September 2014, when Moriarty asked Donal for advice, ACS and its owners have never communicated with Donal about ACS employee compensation.  (E. Moriarty Testimony; D. O'Sullivan Testimony; W. O'Donnell Testimony)

80.     After 2014, every member of ACS's management team has enjoyed significant increases in compensation.  Donal had no input into these raises.  These decisions are made solely by Moriarty, in consultation with O'Donnell.  (E. Moriarty Testimony; J. Kuefner Testimony; W. O'Donnell Testimony)

**(a)     Moriarty Creates TMG**

81.     In May of 2012, Moriarty, while still a Navillus employee, decided to form his own company, The Moriarty Group, LLC d/b/a "TMG Contracting" ("TMG").  TMG operated as Moriarty's own construction contracting and consulting business.  (E. Moriarty Testimony; PX 12)

82.     Moriarty sought opportunities to bid for nonunion concrete construction jobs and he asked his friend Kuefner if he wanted to assist.  Kuefner was a project manager for Navillus at the time, but Navillus' work was slow and, with Donal's blessing,  Kuefner agreed to work with Moriarty submitting bids for TMG.

83.     In 2013, Moriarty asked Downes if Downes would be interested in helping him build TMG.  Downes agreed.  (E. Moriarty Testimony; P. Downes Testimony)

84.     Ultimately Downes spent a few hours reviewing two bids for TMG.  (P. Downes Testimony)

85.     Moriarty and Kuefner began submitting bids for concrete work on behalf of TMG.  Moriarty paid Kuefner an hourly rate as a consultant to TMG.  Donal had no involvement whatsoever in TMG's bids.  (E. Moriarty Testimony; J. Kuefner Testimony)

86.     TMG submitted its first bid to Triton Construction for the concrete superstructure for a project at 551 West 21st Street in or around April 2013.  Kuefner prepared that bid.  Prior to submitting the bid, Moriarty asked Downes to "eyeball" the bid to make sure it was reasonable. (J. Kuefner Testimony; P. Downes Testimony)

87.     Downes met with Kuefner twice, for approximately twenty minutes and made minor suggestions.  Downes did not review the floor plans, blueprints, or any renderings. Downes had no further involvement in TMG's 551 West 21st Street bid.  (E. Moriarty Testimony; J. Kuefner Testimony; P. Downes Testimony; DX 70, 71, 97; PX 15, 16, 18)

88.     In mid-July 2013, TMG was awarded the 551 West 21st Street job.  Shortly thereafter, Moriarty informed Donal that he was leaving Navillus.  (E. Moriarty Testimony; PX 20-24; DX 97)

89.     Moriarty was still owed bonus money for his work on the Rapid Repair Program while at Navillus.  That bonus money could potentially be forfeited due to his leaving Navillus, voluntarily, before all the projects on which he were involved were closed out.  (E. Moriarty Testimony)

90.     Moriarty told Donal he would help Navillus' office personnel transition his responsibilities and would assist with any close out work.  In exchange, he asked Donal to continue to pay his health insurance premiums until he could get his own insurance, to which Donal agreed.  (E. Moriarty Testimony)

(b)     **Moriarty Creates ACS**

91.     Due to insurance issues with TMG, Moriarty formed ACS in July 2013.  ACS exclusively performs concrete construction work (foundations and superstructures) as a sub-contractor on non-union construction projects.  Navillus, by contrast, performs many different kinds of work that ACS simply does not and cannot do.  (E. Moriarty Testimony; J. Kuefner Testimony; W. O'Donnell Testimony; D. O'Sullivan Testimony; PX 42-43)

92.     Insurance is a monumental barrier to entry in the construction market.  When Moriarty started to bid for significant concrete projects, he learned that without adequate insurance, he would be unable to successfully bid for jobs that did not provide for owner-controlled insurance. (E. Moriarty Testimony)

93.     This insurance issue led Moriarty to ask his friend Downes to become involved in ACS.  Downes had the extensive experience and reputation that ACS needed to get off the ground.  Moriarty offered Downes a partnership interest in ACS and Downes accepted.  (E. Moriarty Testimony; P. Downes Testimony)

94.     Downes was listed as the filing party for the company's formation but Moriarty created the company and drafted the initial paperwork.  (E. Moriarty Testimony; P. Downes Testimony)

95.     Donal had nothing whatsoever to do with either the inception or the formation of ACS.  (E. Moriarty Testimony; D. O'Sullivan Testimony)

96.     Downes' responsibilities began to increase and he was uncomfortable with the potential liability, particularly after attending a meeting regarding the certified payroll on the Boston Road project.  Downes then told Moriarty he wanted to step away from the company.  (E. Moriarty Testimony; P. Downes Testimony)

97.     Downes left ACS in the fall of 2013.  Moriarty paid Downes $1,000.  (P. Downes Testimony)

98.     At that time, ACS's total liabilities exceeded its equity by more than $300,000.  Downes has had no further association or involvement with ACS.  (E. Moriarty Testimony; P. Downes Testimony)

99.     Moriarty then asked Hazelyn and Patrick Corcoran to join ACS.  Patrick was an experienced superstructure superintendent and Hazelyn an experienced Project Manager.  They agreed to join ACS. (E. Moriarty Testimony; DX 27)

100.    Moriarty also asked O'Donnell to join ACS and oversee the company's concrete foundation jobs.  (E. Moriarty Testimony; W. O'Donnell Testimony; PX 119)

101.    ACS was thus initially owned, in three equal shares, by Moriarty, O'Donnell and Hazelyn, through three separate holding companies:  TMG Solutions (Moriarty); WOD Solutions (O'Donnell) and LBJ Solutions (Hazelyn).  (E. Moriarty Testimony; W. O'Donnell Testimony; PX 46; DX 27)

102.    No one, other than Downes (very briefly), Moriarty, O'Donnell and Hazelyn has owned ACS.  (E. Moriarty Testimony; W. O'Donnell Testimony)

**(c)     Donal's Limited Startup Assistance to Moriarty**

103.    Donal personally loaned Moriarty a total of $1.8 million in three separate short-term, interest bearing loans.

104.    The first two loans, totaling $500,000, were, in effect, "secured" by the substantial bonus payment that Navillus still owed Moriarty for his leadership role on the Rapid Repair project in Breezy Point, New York, which totaled roughly $700,000.  (E. Moriarty Testimony; D. O'Sullivan Testimony; PX 34 to PX 36)

105.    Each of the three loans was accompanied by a promissory note executed by Moriarty.  (E. Moriarty Testimony; D. O'Sullivan Testimony; PX 34 to PX 36)

106.    All three loans were repaid in full, both principal and interest, by Moriarty in January 2014.  (E. Moriarty Testimony; D. O'Sullivan Testimony)

      **(d)**      **Donal's Limited Involvement in the Boston Road Contract**

107.    ACS secured the Boston Road contract in or around October of 2013.  (E. Moriarty Testimony; J. Kuefner Testimony; DX 67 to DX 69)

108.    No one at Navillus was responsible for the Boston Road job.

109.    ACS employees Hazelyn, Mike Duffy, Patrick Corcoran, and O'Donnell (once he joined ACS) were responsible for managing and supervising the project.  (E. Moriarty Testimony; J. Kuefner Testimony; W. O'Donnell Testimony)

110.    On November 14, 2013, Moriarty met with Donal and described certain issues ACS was having on the Boston Road job.  Moriarty wanted Donal's advice because ACS was losing money on the job and Moriarty was considering pulling out.  Moriarty thought Donal and Mounty were friends and that Donal might be able to help. (E. Moriarty Testimony)

111.    Moriarty asked Donal to call Mounty, but Donal suggested sending an email. Donal dictated an email to Mounty, which Moriarty typed from his iPhone, using the email address officeiphone@acsnyllc.com, and signed it "Donal."  Moriarty wanted Donal to explain

that if Mountco wanted a different contractor to complete the work, ACS would be fine with that. (E. Moriarty Testimony; D. O'Sullivan Testimony)

112.    The email address that was used to email Mounty, "officeiphone@acsnyllc.com", was not Donal's email address. It was a generic email account Moriarty set up when he first created the domain name "acsnyllc.com."  Donal never had control of or access to that account. (E. Moriarty Testimony; D. O'Sullivan Testimony)

113.    Aside from this instance, Moriarty never involved Donal on the Boston Road project.  Despite receiving a few emails regarding Boston Road, Donal had virtually no involvement with the job.  Neither he nor Navillus received any financial benefit from Boston Road.  (E. Moriarty Testimony; D. O'Sullivan Testimony)

114.    Because of O'Donnell's experience in concrete foundations, Moriarty asked him to join ACS.  (E. Moriarty Testimony; W. O'Donnell Testimony)

115.    In November 2013, O'Donnell accepted Moriarty's offer to join ACS, and he soon became involved in the Boston Road job.  (E. Moriarty Testimony; W. O'Donnell Testimony; PX 119: DX 46; DX 51)

### (e)    Navillus Had No Involvement In Other ACS Contracts

116.    ACS bid for concrete foundation work on the City Point project in the latter half of 2013.  Donal never spoke with Moriarty or Kuefner about the bid, securing the contract, or any work on that project.

117.    ACS also submitted a bid to Related in November 2013 to perform work on a project at 205 East 92nd Street.  (DX 19; DX 67-69; DX 90)

118.    After the contract was awarded, ACS needed to secure a tower crane.

119.     Kuefner had briefly considered purchasing a tower crane for ACS itself, but that ultimately proved too costly for a new venture.  ACS instead decided to rent the crane from Manhattan Tool, a company owned by Donal that is separate from and unrelated to Navillus. ACS paid Manhattan Tool $59,881.55 per month, the market rate for such a rental.  When the agreement was made to obtain the crane from Manhattan Tool, Moriarty was not aware it was Donal's company, and learned that after the fact.  (E. Moriarty Testimony; J. Kuefner Testimony; W. O'Donnell Testimony; DX 25; DX 112)

E.     **Findings of Fact Regarding Plaintiffs' Damages Claims**

120.     The Moore Plaintiffs' expert, Sean Donohue ("Donohue"), incorrectly concludes that the Moore Plaintiffs have been damaged in the amount of $71.56 million (as of June 2016) (PX 126).

121.     This damages calculation significantly exaggerates the total hours of actual work performed.

122.     For example, this calculation double-counts benefits on prevailing wage projects, where benefits are already paid by the subcontractor to the workers as if the job were a union job.

123.     Donohue admits that there are inefficiencies in non-union work as compared to union work, causing non-unions jobs to require more working hours to complete the same amount of work as a union job.

124.     Nevertheless, Donohue's damages calculation failed to appropriately account for the inefficiencies of a non-union work by reducing the number of working hours in the calculations.

125.     Wajdi Atallah ("Atallah"), the expert hired by the defendants in *Gesualdi*, estimated this inefficiency to be 22%.  (DX 101)

126.     Donohue also exaggerated damages by using only the highest fringe benefit rates of the most senior employee classification, "journeyman," in the calculations.

127.     Union crews are never comprised exclusively of the highest paid "journeymen."

128.     Based on just these examples, Plaintiffs' damages calculation should be reduced by roughly 4,700 hours.

129.     The Gesualdi Plaintiffs' expert, Edward Federico ("Federico"), also incorrectly calculates that the Gesualdi Plaintiffs were damaged in the amount of $4.48 million.

130.     For example, this calculation includes all Time Square and HDK driver hours subsequent to Sugar Hill even though neither Time Square nor HDK ever again performed concrete construction work.

131.     Atallah opined that the damages for employee driver hours were, at most, $294,489, without interest and liquidated damages.  This is less than one-quarter of Gesualdi Plaintiffs' figure of $1,249,575 (excluding interest and liquidated damages).

132.     Atallah also properly discounted the number of hours based on declarations and/or company information to account for the employees Plaintiffs classified as drivers who spent numerous days and hours performing tasks other than driving.  Atallah concluded the maximum damages, if any, for this group was $444,291.

## II.     NAVILLUS DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

### A.     Use of Post-Discovery Evidence is Essential and Not Prejudicial

1.     Plaintiffs bear the burden of proof with regard to liability.  *United Union of Roofers, Waterproofers & Allied Workers v. A.W. Farrell & Sons, Inc.*, 2012 U.S. Dist. LEXIS 128483 at *19 (W.D.N.Y. 2012).

2.     Damages are only appropriate for the period during which Plaintiffs have demonstrated that Navillus and ACS were, in fact, alter egos.  *Bd. of Trustees of Plumbers,*

*Pipefitters & Mech. Equip. Serv., Local Union No. 392 Pension Fund v. Humbert*, 2017 WL

1177505, at *6 (S.D. Ohio Mar. 30, 2017) (limiting alter ego finding to a specific period of

entanglement).

3.      Plaintiffs cannot claim entitlement to damages for a period of time for which they

seek to preclude Defendants from introducing any evidence.  *Millman v. Provident Life & Acc.

Ins. Co.*, 2015 WL 5507901, at *2 (W.D. Mo. Sept. 17, 2015) (allowing additional evidence of

liability relevant to damages claims up to the date of trial).

4.      Whatever limited assistance Donal and/or Navillus provided to ACS in its

formative period was brief, insubstantial and lawful.  Significantly, it had no effect on the

viability or growth and continued success of Navillus as a union represented company.  *A.W.

Farrell*, 2012 U.S. Dist. LEXIS 128483 at *37 ("limited business advice and operational

support" given during "early stages" and transfer of "vehicles, equipment and materials . . . to

facilitate start-up and initial operations" not sufficient in light of other factors of separateness to

sustain alter ego finding).

5.      Plaintiffs are not prejudiced by the introduction of post-discovery evidence – *see

EMI Music Mktg. v. Avatar Records, Inc.*, 334 F. Supp. 2d 442, 445-46 (S.D.N.Y. 2004) (no

prejudice where Plaintiffs had over two months to review new evidence before trial) (denying

motion *in limine*).

**B.      Neither Time Square Nor ACS is Navillus' Alter Ego**

    **(a)      *Legal Standard***

6.       "The focus of the alter ego doctrine… is on the existence of a disguised

continuance or an attempt to avoid the obligations of a collective bargaining agreement through a

sham transaction or technical change in operations."  *Lihli Fashions Corp. v. N.L.R.B.*, 80 F.3d

743, 748 (2d Cir. 1996), *as amended* (May 9, 1996) (internal quotation marks omitted); *Moore v.*

- 22 -

*Navillus Tile, Inc.*, 2016 WL 750797 at *7 (S.D.N.Y. Feb. 24, 2016, Docket 165) (the "*Moore SJ Decision*").

7.      The alter ego doctrine was "developed by the National Labor Relations Board to prevent attempts by employers to evade their responsibilities under CBAs.  [Courts] thus look to the reported decisions of the Board and to the Second Circuit for guidance on how to determine alter ego status." *In re Armen Digital Graphics Ltd. v. Amalgamated Lithographers of America, Local One*, 1997 U.S. Dist. LEXIS 11938 at *22-23 (S.D.N.Y. Aug. 12, 1997); *Cuyahoga Wrecking Corp. v. Laborers Int'l Union, Local Union #210*, 644 F. Supp. 878, 883 (S.D.N.Y. 1986) ("this 'disguised continuance' concept is at the heart of the Board's alter ego doctrine.")

8.      In determining whether an entity is a disguised continuance of another, courts consider "whether the two enterprises have substantially identical management, business purpose, operations, equipment, customers, supervision, and ownership." *Newspaper Guild of N.Y., Local No. 3 of Newspaper Guild, AFL-CIO v. N.L.R.B.*, 261 F.3d 291, 299 (2d Cir. 2001) (internal quotation marks omitted); *Moore SJ Decision* at *7.

9.      Courts also consider whether there is any evidence of "anti-union animus or any intent to evade union obligations." *Id.* (internal quotation marks omitted).

10.     The alter ego doctrine "usually comes into play when a new legal entity has replaced the predecessor (or at least the unionized portion of the predecessor)." *Id.* at 303 (internal quotation marks omitted).

11.     The alter ego doctrine is an "exception to the doctrine of limited liability." *United Union of Roofers, Waterproofers, & Allied Workers Local No. 210, AFL-CIO v. A.W. Farrell & Son, Inc.*, 547 F. App'x 17, 19 (2d Cir. 2013); *Murray v. Miner*, 74 F.3d 402, 405 (2d Cir. 1996); *see also NetJets Aviation, Inc. v. LHC Communs., LLC*, 537 F.3d 168, 172 (2d Cir. 2008) ("In

the alter-ego analysis of a limited liability company (LLC), somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required.").

12.     Under the doctrine of limited liability, "a corporate entity is liable for the acts of a separate entity only under extraordinary circumstances." *Id*. at 404.  "Similarly, the law only treats the employees of a corporate entity as the employees of a [separate] entity under extraordinary circumstances." *Id*.; *A.W. Farrell*, 547 F. App'x at 19.  Plaintiffs bear the burden of proving that extraordinary circumstances exist warranting the application of the alter ego doctrine.  *A.W. Farrell*, 547 F. App'x at 19; *Finkel v. S.I. Assocs. Co.*, 2008 WL 2630297, at *12 (E.D.N.Y. June 30, 2008).

13.     One entity's support of another during the new operation's infancy or "start-up period" has been held by the NLRB and courts as insufficient for alter ego status.  *See Blue & White Cabs*, 291 NLRB 1047 (1988) ("to restrict consideration of the alter ego issue to Service's formation would distort the picture of Service's essential identity and purpose."); *Marino Electric, Inc.,* 285 NLRB 344, 355 (1987) ("assistance in the formative stage is not determinative" of alter ego status); *L&J Equipment*, 274 NLRB 20, 28 (alleged alter ego that "benefited in its formative period from the use of L  & J's office facilities, from family land connections; from L&J's co-indemnification agreement to support its land reclamation bond, from  . . . extensive credit arrangements . . . and in [numerous] other ways" found not to be alter ego because, over time, in every aspect but financial obligations, the companies were maintained as two totally independent corporations with respect to their operations and control of labor relations"); *see also United Union of Roofers, Waterproofers & Allied Workers v. A. W. Farrell & Sons, Inc.*, 2012 U.S. Dist. LEXIS 128483 at *37 (W.D.N.Y. 2012) ("limited business advice

and operational support" given during "early stages" and transfer of "vehicles, equipment and

materials . . . to facilitate start-up and initial operations" not sufficient in light of other factors of

separateness to sustain alter ego finding).

14.     It is law of the case that "separate alter ego determinations must ultimately be

made for each entity…."  *Moore v. Navillus Tile, Inc.*, 2017 BL 31844 (S.D.N.Y. Jan. 3, 2017,

Docket 204) (the "*Moore Severance Decision*") at 7-8, citing *Lihli Fashions*, 80 F.3d at 748.

15.     The alleged "sham" transactions in which Time Square was involved are separate,

unique and unrelated to the transactions alleged against ACS.  The court applying the test of alter

ego status must "weigh the circumstances of the *individual* case…." *Moore SJ Decision* at *7

(emphasis added, citation omitted).  Thus, the court should not consider the facts and

circumstances that Plaintiffs assert constitute a basis for considering ACS to be an alter ego of

Navillus together with the facts and circumstances that Plaintiffs assert make Time Square an

alter ego of Navillus.

### C.     Time Square is Not the Alter Ego of Navillus

16.     Time Square and Navillus are not alter egos because Time Square is not the

"disguised continuance" of Navillus.  *Lihli Fashions*, 80 F.3d at 748.  Kevin O'Sullivan did not

form Time Square as a "sham transaction or technical change" in Navillus' operations to avoid

Navillus' union obligations.  *Id.* Time Square did not "replace" Navillus or any "unionized

portion" of Navillus.  *Local No. 3*, 261 F.3d 291 at 299.  Donal's limited assistance to his brother

on a single project years after formation and after this Court found the companies separate is not

sufficient to bind Time Square to Navillus' bargaining agreements.  *A.W. Farrell*, 2012 WL

4092598, at *7 (no alter ego where manager of union company claimed to "represent the

interests of both" union and non-union company regarding a project, among other involvement

including ownership ties, overlap in operations, and other managerial and material assistance

such as use of a line of credit to purchase tools, employee training and other payroll and administrative support).

17.     Even if, *arguendo*, Time Square were to be considered the alter ego of Navillus, such a finding could only be with respect to the Sugar Hill project, Time Square's only job as a concrete construction subcontractor and the only project with which Donal or Navillus had even any involvement, albeit minor.  There is simply zero evidence of any nexus, let alone entanglement, since that one project five years ago.  *Bd. of Trustees of Plumbers, Pipefitters & Mech. Equip. Serv., Local Union No. 392 Pension Fund v. Humbert*, 2017 WL 1177505, at *6 (S.D. Ohio Mar. 30, 2017) (on reconsideration, limiting liability to period of entanglement); *Martiki Coal Corp., Subsidiary of Mapco Coal, Inc.*, 315 NLRB 476 (1994) (no joint liability for actions subsequent to untangling); *St Louis Electric, et al.*, 32 NLRB AMR 79 (October 15, 2004) (liability limited to single project).

18.     Even with respect to the Sugar Hill project, however, Time Square cannot be found to be the disguised continuance of Navillus or "an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations." *Lihli Fashions Corp.*, 80 F.3d at 748.  The determination to go open shop, *i.e.*, non-union, on Sugar Hill was that of the general contractor/developer, Mountco.  There is no evidence that Navillus or Time Square in any way impacted the Mountco's decision to proceed non-union. And Time Square bid the project only after the general contractor had already rejected Navillus. Moreover, because Sugar Hill was a public project, Time Square was subject to prevailing wage requirements, meaning Time Square was required to pay salaries and fringe benefits virtually identical to those required under the local collective bargaining agreements of the relevant trades.

**(a)**    ***Time Square and Navillus Do Not Have Substantially Identical
Management, Supervision, and Ownership***

19.    Time Square and Navillus do not have substantially identical ownership.  Donal is
the 100% owner of Navillus and has been since 2015.  Kevin O'Sullivan is the 100% owner of
Time Square and has been since April 1, 2012 pursuant to a January 2012 contract.  *A.W.
Farrell*, 2012 WL 4092598 at *13; *Armen*, 1997 WL 458738, at *7 n.9 ("Were courts to assume
alter ego status merely from the closely held ownership of two companies by members of the
same immediate family, families would be effectively precluded from organizing their business
affairs in any but a single corporate entity."); *Trustees of Empire State Carpenters Annuity,
Apprenticeship, Labor-Mgmt. Co-op., Pension & Welfare Funds v. JJJ Concrete Corp.*, 2015
WL 790085, at *9 (E.D.N.Y. Feb. 24, 2015) ("Although family connections between two
corporations can be used to satisfy the common ownership requirement, that is only true
provided the other factors are also satisfied."); *Mason Tenders Dist. Council Welfare Fund v.
Kan Klean Indus.*, 1996 U.S. Dist. LEXIS 11295, at *1 (S.D.N.Y. Aug. 7, 1996) (no
substantially identical ownership where the majority owner of the alleged alter ego was non-
controlling owner of the original company); *N. Kofsky & Son, Inc.*, 2015 WL 59173, at *10
("different ownership arrangements" cut against alter ego finding even where sole owner of
union company was 51% owner of non-union company); *Blue & White Cabs*, 291 NLRB 1047
(1988) (changes in ownership over time are relevant to analysis, noting that common ownership
and management during the formative period does not establish an alter ego relationship); *see
also Time Square Const., Inc. v. Mason Tenders Dist. Council of Greater N.Y. & Long Island*,
2008 WL 55116, at *6 (S.D.N.Y. Jan. 2, 2008) (common ownership alone not sufficient for an
alter ego finding).

20.     Likewise, Donal is solely responsible for the management and supervision of Navillus and has been since Kevin resigned from Navillus to form Time Square in 2006.  Kevin has always been solely responsible for the management and supervision of Time Square without any input from Donal.  The law is clear:  Donal's limited advice and assistance to his brother on the Sugar Hill project falls far short of establishing substantially identical management.  *A.W. Farrell*, 2012 WL 4092598 at *7 (no substantially identical management where manager of union shop claimed to represent non-union shop in resolution of a dispute, held weekly meetings with non-union manager to discuss operations); *Armen Digital*, 1997 WL 458738, at *9 (not substantially identical management or supervision where owner of one company represented self as "president" of the other, stated that she was "in charge here," and shared check-signing authority across both companies); *Finkel v. S.I. Assocs. Co.*, 2008 WL 2630297, at *13 (E.D.N.Y. June 30, 2008) ("limited testimony" that owner of non-union shop who was former owner of and brother of current owner of union shop "was occasionally consulted on the business of [union shop] was insufficient to sustain Plaintiff's burden of proving common ownership and management"); *Time Square Const., Inc.*, 2008 WL 55116, at *6 (occasional signing of documents by non-controlling owner not sufficient to establish common management); *A & M Heating*, 314 F. Supp. 2d at 332 (wife of owner of union entity managed subsequent non-union entity but had no involvement in management of union entity); *Kan Klean*, 1996 U.S. Dist. LEXIS 11295, at *19-20 (shared owner-president and owner-manager insufficient to establish substantially identical management where third owner of union entity was not involved with non-union entity).

21.     The hiring of a handful of former Navillus employees in 2006 does nothing to alter the result, particularly when placed in the context of the thousands of Navillus employees

who have never worked for Time Square.  Nor does the hiring of three former Navillus

employees (two as independent contractors through their own consultancies) and one then-

current Navillus employee (as an independent contractor through his own consultancy) to work

on a single job for Time Square establish that Navillus and Time Square had substantially

identical management or supervision.  *Canada Dry Bottling Co. of N.Y.*, 2000 WL 1886616, at

*4 (S.D.N.Y. Dec. 29, 2000) ("[T]he mere transfer of low and middle managers does not

establish an identity in the management … sufficient to support alter ego status.").

> **(b)**   ***Time Square and Navillus Do Not Have Substantially Identical Business Purposes***

22.     "The main focus of the alter-ego inquiry is to determine whether the two

employers are the same business in the same market."  *N.Y. State Teamsters Conference Pension*

*& Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 650 (2d Cir. 2005) (internal citation and

quotation marks omitted).

23.     "In the ordinary case, two entities have the same 'business purpose' if they deal in

the same product or service," but "differences in financial and strategic goals may be considered

when evaluating a company's business purpose."  *Local No. 3*, 261 F.3d at 299, 301.

24.     To demonstrate substantially identical business purposes, it is not enough for two

entities to operate in the same broadly defined industry; rather, they must deal in the same

product or service in the same market.  *A.W. Farrell*, 2012 WL 4092598, at *14-15 (finding two

roofing companies that performed different roofing services using different roofing techniques

not alter egos); *Express Servs.*, 426 F.3d at 650 (no common business purpose where companies

"engaged in different, though related, lines of business within the freight transportation

industry"); *Armen Digital Graphics, Ltd., Amalgamated Lithographers of Am., Local One*, 1997

WL 458738 (S.D.N.Y. Aug. 12, 1997) (holding that two companies that performed work in the

lithography industry had separate business purposes and were not alter egos because they used different methods to create their products); *N. Kofsky & Son, Inc.*, 2015 WL 59173, at *10 (while both companies performed plumbing work, they had separate business purposes where one company performed complete renovations whereas alleged alter ego's work was much more limited in scope); *JJJ Concrete Corp.*, 2015 WL 790085, at *10 (finding "scant evidence that Defendants share the same business purpose" because even though "both Defendants may lay concrete, that is where the similarity ends").

25.     In bifurcated markets where union and non-union entities generally compete for different jobs, they do not have substantially identical business purposes because they do not operate in substantially the same market.  *A.W. Farrell*, 2012 WL 4092598, at *14-15 (finding non-union roofing contractor had a separate business purpose and was not an alter ego of a union roofing contractor in part because the union contractor "derives a substantial portion of its income from . . . contracts subject to prevailing wage requirements," which the non-union contractor never sought or performed); *Marino Elec., Inc.*, 285 N.L.R.B. 344, 354-55 (1987) (holding that a non-union electrical contractor was not an alter ego of a union electrical contractor because the two contractors operated in different markets and were not competitors).

26.     Navillus and Time Square are not competitors and, thus, do not have substantially identical business purposes.  They operate different businesses (*i.e.*, Navillus is primarily a subcontractor and Time Square is a general contractor) in entirely separate markets (*i.e.*, Navillus works in the union market and does not bid for non-union work and Time Square bids and works exclusively in the non-union or open shop market).  *Express Servs.*, 426 F.3d at 650; *Marino Elec.*, 285 N.L.R.B. at 354-55; *JJJ Concrete Corp.*, 2015 WL 790085, at *10; *A.W. Farrell*, 2012 WL 4092598, at *14-15.

27.     When Navillus operates as a general contractor, it works on public restoration jobs where it can self-perform a majority of the trade work.  Apart from Sugar Hill, Time Square has never been a subcontractor and never worked on a prevailing wage or public construction job.  Even when Navillus and Time Square both bid work as general contractors, they do not compete with each other since Navillus only acts as a general contractor on public restoration jobs where it self-performs the work and Time Square does not work on these jobs, only seeking general contractor work on private developer jobs.  *Time Square Constr.*, 2008 WL 55116, at \*6; *Express Servs.*, 426 F.3d at 650; *Brown*, 1997 WL 1093463, at \*5 (no common business purpose where one entity performed commercial contracts and the other "mainly" worked on residential contracts).

### (c)     *Time Square and Navillus Do Not Have Substantially Identical Operations*

28.     Navillus and Time Square do not have substantially identical operations; Time Square and Navillus each have separate offices and facilities with independent telephone and computer systems, separate employees, their own support staffs and separate payroll management and business systems.  They file their own taxes, have separate financial statements, keep separate insurance policies, maintain separate corporate forms and records, keep separate accounts at different banks, and independently contract for professional services, among other distinctions.  *A & M Heating*, 314 F. Supp. 2d 332, 349 (S.D.N.Y. 2004) (operations not identical where entities had separate facilities); *N. Kofsky*, 2015 WL 59173, at \*10 (separate bank accounts and leases); *JJJ Concrete Corp.*, 2015 WL 790085, at \*9 ("Defendants never comingled bank accounts or any other kind of financial accounts" and did not share insurance).

29.     Time Square and Navillus at one point had *adjacent* yards separated by a ten-foot high fence at a location where they had separate leases.  Time Square also assumed the lease on a

yard in New Jersey *after* Navillus ceased using the facility.  Neither is sufficient to establish

substantially identical operations.  *Kan Klean*, 1996 U.S. Dist. LEXIS 11295, at \*21 (adjacent

offices did not support alter ego finding); *A.W. Farrell*, 2012 WL 4092598 at \*13 (rent-free use

of facility owned by owner of union shop did not establish identical operations); *Armen*, 1997

WL 458738, at \*7, \*9 (*shared* offices did not establish substantially identical operations); *JJJ*

*Concrete Corp.*, 2015 WL 790085, at \*8-9 (no shared operations despite use of shared yard,

office space, telephone and fax number); *N. Kofsky*, 2015 WL 59173, at \*10 (companies that had

"separate leases for [a] shared office space" not alter egos); *see also Express Servs.*, 426 F.3d at

650 ("Nor are the Fund's allegations of a common mailing address and shared management

sufficient by themselves to raise a triable issue of fact.").  Further, since November 1, 2006,

Time Square has been located at 355 Lexington Avenue in Manhattan, a space never shared with

Navillus (or ACS).

      30.     Nor does Plaintiffs' allegation that a grand total of 16 employees and laborers

have separately worked for Navillus and Time Square over the years, particularly in light of the

fact that thousands of people have worked for Navillus during that time period, suffice to make

them alter egos.  *Time Square*, 2008 WL 55116, at \*6 (fact that certain former Navillus

employees joined Time Square did not establish alter ego relationship); *N. Kofsky*, 2015 WL

59173, at \*11 (fact that 1/3 of union employees later worked for non-union company, as did

office personnel and management, did not support alter ego finding); *JJJ Concrete Corp.*, 2015

WL 790085, at \*7-10 (no alter ego factors met where a dozen employees worked

*interchangeably* between two entities).  In fact of the 16 persons Plaintiffs list, two, David Ashe

and O'Donnell, were never employed in any capacity by either Time Square or HDK, 3 were

consultants through their consulting companies, and 7 were laborers employed by HDK without any knowledge of their prior (or future) employers.

31.    Nor is it probative that Time Square and Navillus have at different times utilized common institutions for professional services, such as accountants, attorneys, or brokers.  *JJJ Concrete Corp.*, 2015 WL 790085, at *7-10 (shared accountant and "some suppliers" did not establish any alter ego factors); *N. Kofsky*, 2015 WL 59173, at *11 (same).

        (d)    ***Time Square and Navillus Do Not Have Substantially Identical Equipment***

32.    Time Square and Navillus have never shared equipment or treated equipment interchangeably.  Rather, Time Square purchased two vehicles and $40,000 worth of scaffolding from Navillus at fair market value.  That Time Square used a Navillus truck for the sole purpose of delivering the scaffolding it had just bought from Navillus does not constitute impermissible sharing.  *A.W. Farrell*, 547 F. App'x at 21 (even where one company provided substantially all of another company's equipment "free of charge" this did not support an alter ego finding where "the transfer was complete, i.e., the companies did not thereafter share the equipment."); *Marino Elec.*, 285 N.L.R.B. at 353-54; *A&M Heating*, 314 F. Supp. 2d at 349; *N. Kofsky*, 2015 WL 59173, at *5.

        (e)    ***Time Square and Navillus Do Not Have Substantially Identical Customers***

33.    Besides two instances ten years ago when Time Square hired Navillus as a subcontractor – compared with the more than 100 customers and over 400 projects Navillus has worked since 2011 – Time Square and Navillus have never shared customers, and the fact that Time Square only bid on the Sugar Hill project after Navillus was told it had been rejected for the project only further demonstrates the nonexistence of overlap in customers.  *N. Kofsky*, 2015 WL 59173, at *11 ("some overlap" in clients did not support alter ego finding); *JJJ Concrete*

- 33 -

*Corp.*, 2015 WL 790085, at *8-10 (concrete companies not alter egos where they did not share customers; companies "do not, and cannot, cater to the same clients"); *Marino Elec., Inc.*, 285 NLRB 344 (1987) (no alter ego even where entities shared roughly 50% of customers).

34.     Even on those first two Time Square jobs ten years ago, there was no common customer.  As general contractor, Time Square's customer was the owner/developer.  As concrete construction subcontractor, Navillus' customer was the general contractor, Time Square.  Time Square's retention of Navillus actually epitomizes the separateness of the two and, moreover, redounded to the union funds' benefit since Navillus used only union workers and made all required benefit fund contributions.

### (f)     *There is No Evidence of Anti-Union Animus*

35.     There is no evidence that Donal, a career-long union employer has ever exhibited, much less taken any actions motivated by, anti-union animus.  *A.W. Farrell*, 2012 WL 4092598, at *15 ("career-long union" employer exhibited no animus by funding a non-union shop).

36.     Nor is there any evidence that Kevin O'Sullivan, a former union tradesman himself, has any anti-union animus.  Kevin O'Sullivan's desire to run a non-union company is both legal and is not indicative of animus.  *Marino Elec., Inc.*, 285 NLRB 344 (1987); *Kan Klean Indus.*, 1996 U.S. Dist. LEXIS 11295, at *1 (mere fact that owner of former union company formed non-union company does not evidence animus); *JJJ Concrete Corp.*, 2015 WL 790085, at *10 ("[T]here is no evidence that [non-union concrete company] was formed to overtake [union concrete company's] customer base.").

### (g)     *Totality of the Factors Preclude Alter Ego Finding*

37.     Time Square is not the disguised continuance of Navillus.  *Lihli Fashions*, 80 F.3d at 748.  Time Square was created over ten years ago with a wholly separate purpose from Navillus: to serve as a general contractor on private, new development work, which Navillus

- 34 -

does not perform, and has only once performed as a subcontractor.  Nor was Time Square created as a sham transaction for the purpose of evading Navillus' union obligations.  *Id.* Navillus remains a growing and diversified construction company that continues to perform concrete superstructure work and make substantial payments to the Plaintiffs.  *Newspaper Guild*, 261 F.3d at 303 (alter ego doctrine "usually comes into play when a new legal entity has replaced the predecessor").  Given Navillus' and Time Square's mutually exclusive continued operations performing wholly different work in wholly different markets, the evidence does not support a finding that Time Square was Navillus' disguised or sham continuance.

38.     Likewise, the alter ego factors support these conclusions.  Time Square and Navillus do not have substantially identical management, business purpose, operations, equipment, customers, supervision, or ownership, nor is there any evidence of anti-union animus. *Newspaper Guild*, 261 F.3d at 299.

39.     In seeking to establish Time Square and Navillus as alter egos – despite years of actual and threatened litigation and campaigns against Time Square, as well as all of the extensive discovery in this case – Plaintiffs rely almost entirely on the fact that Donal and Kevin are brothers and, on a single project performed by Time Square, Donal provided very limited advice and allowed four Navillus employees (one former) who worked on the project as consultants.  Such assistance is woefully short of what courts require before making an extraordinary finding that two companies are essentially one in the same.  *JJJ Concrete*, 2015 WL 790085, at *7-9 (finding no "substantially identical" factors present despite close family connections and mutual presence in the concrete business (serving divergent clients), evidence of interchange of employees, and various shared operations); *A.W. Farrell*, 2012 WL 4092598, at *10-15 (not alter ego despite close family connections, weekly meetings between management to

provide advice; manager of union company represented non-union company to outside interests; other indicia of overlap not present here); *Canada Dry*, 2000 WL 1886616, at *4 ("[T]he mere transfer of low and middle managers does not establish an identity in the management … sufficient to support alter ego status.").

40.     Critically, Time Square's isolated foray into concrete subcontracting on a single project is insufficient to establish substantially identical business purposes, which cuts strongly against an alter ego finding.  *A.W. Farrell*, 2012 WL 4092598, at *14-15; *JJJ Concrete*, 2015 WL 790085, at *7-9; *Lihli Fashions*, 80 F.3d 743 (common ownership and control outweighed by distinct business purpose despite performing related function in same industry); *Armen Digital Graphics*, 1997 WL 458738 (shared offices, equipment, customers; close family relationship, but different (although related) business purpose); *Express Servs., Inc.*, 426 F.3d 640 (allegations that the alleged alter egos shared common mailing address and management were not sufficient where the entities engaged in "different, though related lines of business within the freight transportation industry," and no record of shared customer base or equipment); *Newspaper Guild*, 261 F.3d at 302-03.

###### D.     ACS is Not the Alter Ego of Navillus

41.     ACS is not the alter ego of Navillus because ACS is not the "disguised continuance" of Navillus.  *Lihli Fashions*, 80 F.3d at 748.  Moriarty did not form ACS as a "sham transaction or technical change" in Navillus' operations to avoid Navillus' union obligations.  *Id.*  ACS did not "replace" Navillus or any "unionized portion" of Navillus. *Newspaper Guild*, 261 F.3d 291 at 299.

42.     The minimal assistance provided by Donal to Moriarty during ACS's formative "start-up period" is not germane to the liability analysis.  *A.W. Farrell*, 2012 WL 4092598, at *14-15 (holding that two companies were not alter egos, stressing: "[a]part from the limited

business advice and operational support provided [during the formative stages of the alleged alter

ego] . . . [that alleged alter ego] did not consult with or receive any substantial managerial

direction from" anyone at the other company); *Blue & White Cabs*, 291 N.L.R.B. at 1048 ("Nor

does the fact that Service and Pioneer shared common ownership and management during

Service's formative period establish an alter ego relationship between the two companies.");

*Marino Elec.*, 285 N.L.R.B. at 355 ("[A]ssistance in the formative stage is not determinative.");

*In re Hill Indus.*, 320 N.L.R.B. at 1119-20 (same); *L&J Equip.*, 274 N.L.R.B. at 27-29 (same).

43.     Even if ACS was ever the alter ego of Navillus, such a finding could only stand

with respect to the very limited period of time that ACS received assistance from Navillus.

*Humbert*, 2017 WL 1177505, at *6 (finding that companies disentangled and ceased to be alter

egos); *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 157 (2d Cir. 2014) (declining to overturn

jury's single-employer finding with respect to specific claims, but clarifying: "We do not mean

to imply that Lackawanna and its parent company would have constituted a single entity for all

purposes."); *Martiki Coal Corp.*, 315 NLRB 476; *St Louis Electric*, 32 NLRB AMR 79.

### (a)     *ACS and Navillus Do Not Have Substantially Identical Management, Supervision, or Ownership*

44.     ACS and Navillus do not have substantially identical ownership.  Donal is the

100% owner of Navillus.  Moriarty and O'Donnell are the sole owners of ACS.  Hazelyn

formerly owned 1/3 of ACS.  Peter Downes, who has never had any ownership interest in

Navillus, was briefly the owner of ACS during its first few months of existence.  Donal has

never owned ACS.  Neither Moriarty, O'Donnell, nor Hazelyn has ever had any ownership

interest in Navillus.  *A.W. Farrell*, 2012 WL 4092598 at *13.

45.     Donal's assistance to Moriarty, through loans to get ACS off the ground and

advice during ACS's formative stages, does not establish substantial identity of ownership or

management, nor does Donal's purchasing *options* to potentially purchase ACS make him an

owner.  *A.W. Farrell*, 2012 WL 4092598 at *13 (gifting the money to purchase another business

does not create substantial identity of ownership; weekly meetings with management during

start-up phase not probative); *id.* at *7 (no substantially identical management where manager of

union shop claimed to represent non-union shop in resolution of a dispute); *Armen Digital*, 1997

WL 458738, at *5, *8 (personal loans from owner of union shop with no obligation to repay did

not evidence common ownership); *id* at *9 (evidence that owner of one company represented self

as "president" of the other and represented she was "in charge here," shared check-signing

authority across two companies insufficient to establish substantially identical management or

supervision); *L&J Equip.*, 274 N.L.R.B. at 28-29 (similar); *Finkel*, 2008 WL 2630297, at *13

("limited testimony" that owner of non-union shop and former owner of union shop "was

occasionally consulted on the business of [union shop] was insufficient to sustain Plaintiff's

burden of proving common ownership and management"); *N.Y. State Teamsters Conference

Pension & Ret. Fund ex rel. Bulgaro v. Doren Ave. Assocs., Inc.*, 321 F. Supp. 2d 435, 449

(N.D.N.Y. 2004) (priority right in potential liquidation proceeds, right of first refusal in any

attempted sale of alleged alter ego did not establish common ownership), *aff'd sub nom.*, *Express

Servs., Inc.*, 426 F.3d 640 (2d Cir. 2005).

   46.   Nor does Moriarty's minor and isolated use of Navillus resources while still

employed by Navillus, such as his use of a company credit card, establish any level of control

sufficient to establish substantially identical management.  *L & J Equip.*, 274 NLRB 20, 28

(1985) (overlap where founder of alleged alter ego continued to work for previous company

during formative stages, used address and phone number, numerous other "benefit[s] in its

formative period" do not establish common ownership or management); *A.W. Farrell*, 2012 WL

4092598 at *10-15 (assistance during "start-up period," including gifting of equipment, use of

real property, funds to purchase entity, not enough); *Doren Ave. Assocs.*, 321 F. Supp. 2d at 449

(fact that alleged alter ego listed union entity's address as principle place of business on

corporate formation documents insignificant where all other evidence established that

companies' principal places of business were elsewhere).

47.      The fact that ACS's owners and certain managers held midlevel positions at

Navillus does not establish common management or supervision. *Canada Dry*, 2000 WL

1886616, at *4 ("[T]he mere transfer of low and middle managers does not establish an identity

in the management … sufficient to support alter ego status."); *Armen Digital*, 1997 WL 458738,

at *9 (common administrator not sufficient).  Nor does Peter Downes' minimal involvement

reviewing bids for TMG and ACS prior to relinquishing his ownership of ACS.  *JJJ Concrete

Corp.*, 2015 WL 790085, at *8-9 (no alter ego factors met where union company's estimator

performed services free of charge to non-union company); *A.W. Farrell*, 2012 WL 4092598 at

*10 (salesman for union company responsible for 50% of non-union company's sales).

> **(b)    *ACS and Navillus Do Not Have Substantially Identical Business
> Purposes***

48.      Navillus and ACS do not compete for work because they are in different

businesses (*i.e.*, Navillus performs several different trades and ACS performs exclusively

concrete superstructure and foundation work) in entirely separate markets (*i.e.*, Navillus operates

primarily in the union market and only occasionally bids on select open shop work and

prevailing wage jobs, but never in the non-union market; ACS bids and works exclusively in the

non-union or open shop market).  *Express Servs.*, 426 F.3d at 650 (no common business purpose

where companies "engaged in different, though related, lines of business within the freight

transportation industry"); *A.W. Farrell*, 2012 WL 4092598, at *14-15 (non-union roofing

contractor had separate business purpose than union roofing contractor in part because the union contractor "derives a substantial portion of its income from . . . contracts subject to prevailing wage requirements," which the non-union contractor never sought or performed); *Marino Elec.*, 285 N.L.R.B. at 354-55 (non-union and union electrical contractors operated in different markets and were not competitors because union and non-union status forced them to bid on different work); *JJJ Concrete Corp.*, 2015 WL 790085, at *10 (while "both Defendants may lay concrete, that is where the similarity ends" because "Defendants' projects never overlap, and Defendants do not compete against each other because they do not … cater to the same clients."); *N. Kofsky & Son, Inc.*, 2015 WL 59173, at *10 (while both companies performed plumbing work, union entity performed various other trades).

49.     Even when Navillus and ACS both seek to perform concrete superstructure work, they do not bid against each other because they operate in separate markets, and because they operate in separate markets, they have distinct financial and strategic goals and approaches to achieving their individual objectives.  *Local No. 3*, 261 F.3d at 299-300; *Armen Digital*, 1997 WL 458738, at *8; *Marino Elec.*, 285 N.L.R.B. at 354-55; *JJJ Concrete Corp.*, 2015 WL 790085, at *10.

    **(c)**  ***ACS and Navillus Do Not Have Substantially Identical Operations***

50.     ACS and Navillus do not have substantially identical operations; ACS and Navillus each have separate offices and facilities with independent telephone and computer systems, separate employees, their own support staffs, separate payroll management and business systems, they file their own taxes, have separate financial statements, keep separate insurance policies, maintain separate corporate forms and records, keep separate bank accounts and independently contract for professional services, among other distinctions.  *A & M Heating*, 314 F. Supp. 2d at 349 (separate facilities); *N. Kofsky*, 2015 WL 59173, at *10 (separate bank

accounts and leases); *JJJ Concrete Corp.*, 2015 WL 790085, at *9 ("Defendants never

comingled bank accounts or any other kind of financial accounts.").

51.     ACS and Navillus at one point had separate facilities on the same block in Queens

under separate leases.  This is not nearly sufficient to establish substantially identical operations.

*Kan Klean*, 1996 U.S. Dist. LEXIS 11295, at *21 (adjacent offices did not support alter ego

finding); *A.W. Farrell*, 2012 WL 4092598 at *13 (rent-free use of facility owned by owner of

union shop insufficient); *Armen*, 1997 WL 458738, at *7, *9 (*shared* offices insufficient); *N.

Kofsky*, 2015 WL 59173, at *10 ( "separate leases for [a] shared office space"); *JJJ Concrete

Corp.*, 2015 WL 790085, at *7-10 (*shared* yard, office space, telephone and fax machine).  Nor

does the fact that Moriarty briefly used the address of a former Navillus colleague (in an

apartment which he did not know belonged to, but was not inhabited by, Donal's wife), support

an alter ego finding.  *Express Servs.*, 426 F.3d at 650 ("Nor are the Fund's allegations of a

common mailing address and shared management sufficient by themselves to raise a triable issue

of fact.").

52.     Nor does Plaintiffs' allegation that a grand total of 32 employees and workers

have separately worked for ACS and Navillus over the years, particularly in light of the fact that

thousands of people have worked for Navillus during that time period.  *Time Square*, 2008 WL

55116, at *6 (fact that certain former Navillus employees joined Time Square did not establish

alter ego relationship); *N. Kofsky*, 2015 WL 59173, at *11 (fact that 1/3 of union employees also

worked for non-union company, as did office personnel and management,  did not support alter

ego finding); *JJJ Concrete Corp.*, 2015 WL 790085, at *8-9 (no alter ego factors met where

companies shared a dozen employees).

53.     Nor is it probative that ACS and Navillus have at various times utilized common institutions for professional services, such as accountants, brokers and banks.  *JJJ Concrete Corp.*, 2015 WL 790085, at *7-10 (shared accountant and "some suppliers" did not establish any alter ego factors); *N. Kofsky*, 2015 WL 59173, at *11 (same).

### (d)     *ACS and Navillus Do Not Share Substantially Identical Equipment*

54.     ACS's lease of a crane, in an arm's length transaction, from an entity other than Navillus (albeit owned by Donal) does not establish ACS and Navillus had substantially identical equipment.  *A.W. Farrell*, 547 F. App'x at 21 (entities were not alter egos where union company provided all of non-union company's equipment during startup phase); *Marino Elec.*, 285 N.L.R.B. at 353-54; *A&M Heating*, 314 F. Supp. 2d at 349; *N. Kofsky*, 2015 WL 59173, at *5

55.     Nor does an isolated incident in which an ACS employee took equipment from Navillus' yard without permission.  *Id.*

### (e)     *ACS and Navillus Do Not Have Substantially Identical Customers*

56.     The single customer Plaintiffs allege ACS and Navillus to have shared does not suffice to establish that ACS and Navillus have substantially identical customers.  *N. Kofsky*, 2015 WL 59173, at *11 ("some overlap" in clients did not support alter ego finding); *JJJ Concrete Corp.*, 2015 WL 790085, at *8-9 (concrete companies not alter egos where they did not share customers); *Marino Elec.*, Inc., 285 NLRB 344 (1987) (no alter ego where entities shared roughly 50% of customers).

### (f)     *There is No Evidence of Anti-Union Animus*

57.     There is no evidence of anti-union animus on the part of Donal.   Nor is there any evidence of animus on the part of Moriarty merely because he started his own, non-union company.

- 42 -

### (g)   *Totality of the Factors Preclude Alter Ego Finding*

58.     ACS is not the disguised continuance of Navillus, nor did Moriarty create ACS as a sham transaction for the purpose of Navillus evading its union obligations.  *Lihli Fashions*, 80 F.3d at 748.  Navillus remains a growing and diversified construction company that continues to perform concrete superstructure work and make substantial payments to the Plaintiffs. *Newspaper Guild*, 261 F.3d at 303 (alter ego doctrine "usually comes into play when a new legal entity has replaced the predecessor").  ACS did not subsume Navillus' concrete operation, nor did it (or could it) assume Navillus' customer base or contracts.  *Kan Klean*, 1996 U.S. Dist. LEXIS 11295, at *21.

59.     Analysis of the alter ego factors supports this conclusion.  None of the alter ego factors is met.  ACS and Navillus do not now nor have they ever had substantially identical management, business purpose, operations, equipment, customers, supervision, or ownership, nor is there any evidence of anti-union animus.  *Newspaper Guild*, 261 F.3d at 299.

60.     Rather than establish that any of the alter ego factors is met – despite a prolonged corporate campaign and investigation against ACS and the extensive discovery conducted in this case – Plaintiffs rely on flimsy circumstantial evidence to prop up what amounts to a conspiracy theory that Donal secretly controlled ACS.  But the evidence of Donal's limited assistance to Moriarty during ACS's formative "start-up" period is neither material nor sufficient to establish that ACS and Navillus were alter egos.  The fact that Moriarty sought, received, and even helped himself to assistance from his former employer during ACS's nascent months is not germane to the alter ego analysis.  *A.W. Farrell*, 2012 WL 4092598, at *10-15 (union company and owner provided funding to purchase non-union company, free equipment, lease, management advice, operational support and manpower, solicited work and represented non-union company to outside interests); *L & J Equip. Co.*, 274 NLRB at 28 (still not alter ego despite funds from

owner of union company, use of address and phone number in "initial phases", no-fee leases,

insurance, co-indemnification of bonds, and overlap in employment while starting new

company).

61.     Likewise, the assistance provided – essentially loans, advice, and arms length

business transactions – simply does not establish an alter ego relationship. *JJJ Concrete*, 2015

WL 790085, at *7-9 (no "substantially identical" factors present where there were close family

connections between owners of two concrete companies with nonetheless distinct business

purposes despite evidence of some interchange of employees, use of a shared yard and office and

use of a common estimator, telephone, and fax machine); *Marino Elec.*, 285 NLRB 344 (despite

common ownership and control, shared administrative services, arms-length (if informal)

transactions for equipment and office space, and overlap in customers, double-breasted operation

successfully kept separate with lawful motive of maintaining separate entities competing for

different work).

62.     The lack of substantially identical management, operations, equipment,

customers, supervision, or ownership is particularly fatal given ACS's and Navillus' lack of

substantially identical business purpose. *Newspaper Guild*, 261 F.3d at 302-03 (separate

business purpose – despite owning the exact same newspaper – despite common

ownership/control, exact same management, supervisors and board of directors); *Lihli Fashions*,

80 F.3d 743 (common ownership and control outweighed by distinct business purpose despite

performing related function in same industry); *Armen Digital Graphics*, 1997 WL 458738

(shared offices, equipment, customers; close family relationship, but different (although related)

business purpose); *Express Servs.*, Inc., 426 F.3d 640 (allegations that the alleged alter egos

shared common mailing address and management were not sufficient where the entities engaged

in "different, though related lines of business within the freight transportation industry," and no

record of shared customer base or equipment).

### E.  There Can be No Individual Liability for ERISA Fraud

63.     "[A]n individual is not liable for corporate ERISA obligations solely by virtue of

his role as an officer, shareholder, or manager."  *Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir.

1993), *cert. denied*, 508 U.S. 973 (1993).

64.     Only where there are "special circumstances" beyond an individual's officer

status or corporate duties should the courts impose personal liability for a corporation's ERISA

obligations.  *Sasso*, 985 F.2d at 50.  Courts have found such "special circumstances" where (1)

the defendant engaged in fraud related to the non-payment of benefit funds under ERISA,

*Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 35 F.3d 29, 35 (2d Cir. 1994),

(2) the corporation is the defendant's "alter ego," *Sasso*, 985 F.2d at 51, (3) the defendants had

acted in concert with fiduciaries in breaching fiduciary obligations, had "intermix[ed]" assets of

the corporation with assets of their own and of related corporations, and had used corporate

assets for their personal benefit instead of for meeting ERISA obligations, *Lowen v. Tower Asset

Management, Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987), or (4) "there [was] clear and explicit

evidence" of the parties' intent that the individual defendant be personally bound.  *Mason

Tenders Dist. Council Welfare Fund v. Thomsen Constr. Co.*, 301 F.3d 50, 53 (2d Cir. 2002).

65.     Courts apply a two-step analysis to determine whether an individual defendant

should be held personally liable for fraudulent conduct.  *First*, the court must determine whether

the individual is a "controlling corporate official."  *Lollo*, 35 F.3d at 33.  A determination that an

individual is a "controlling corporate official" involves examining the "officer's actual role in the

company's affairs and relationship to the company's wrongdoing."  *Id.* at 33.

66.     *Second*, the court must determine whether the individuals have engaged in fraudulent behavior with respect to the fund contributions by establishing the common law elements of fraud.  *Lollo*, 35 F.3d at 33.  Specifically, there must be a showing that the individuals (1) made a material false representation or omission of fact, (2) with knowledge of its falsity and with the intent to defraud, (3) and there was reasonable reliance, and (4) damages resulting to the plaintiffs.  *Id.*  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).

67.     Significantly, if there is no finding that the defendant organizations are alter egos, "no rational trier of fact could conclude that [the individual defendants] acted with the intent to defraud, or acted in concert with anyone to avoid any collective bargaining obligations," and there can be no individual liability.  *A.W. Farrell*, 2012 WL 4092598, at *17.

68.     Similarly, an alter ego finding is not sufficient to conclude that the defendants engaged in fraudulent conduct.  *See Trustees of Plumbers & Pipefitters Nat. Pension Fund v. De-Con Mech. Contractors, Inc.*, 896 F. Supp. 342 (S.D.N.Y. 1995) (granting defendants' motion to dismiss, stating that "even if Plumbing were the alter ego of Mechanical this is not sufficient standing alone to support an allegation of fraud").

69.     Neither Donal, Kevin, nor Helen can be found individually liable under ERISA § 502, as amended, 29 U.S.C. § 1132.  No "special circumstances" are present here to justify individual liability.  *Sasso*, 985 F.2d at 50.  Neither Donal, Kevin nor Helen are "controlling corporate officials" involved in wrongdoing, and none of them defrauded the pension funds.

70.     As a threshold matter, because there is no alter ego or disguised operation, there is no "wrongdoing" for which anyone can be individually liable.  Plaintiffs admit that Navillus has never failed to make a pension contribution on behalf of any Navillus employee.

### (a) *The Controlling Corporate Official Prong is Not Met*

71.     An individual is not a "controlling corporate official" merely because of his "dominant role in the affairs of a corporate employer." *Sasso*, 985 F.2d at 51.  Rather, courts require there to be sufficient facts establishing that the individual was personally involved in defrauding the pension funds.  *See Lollo I*, 35 F. 3d at 33 (court "must examine the officer's actual role in the company's affairs and the relationship to the company's wrongdoing").

72.     The requisite personal involvement is clear and direct.  In *Lollo I*, the Second Circuit held the district court erred in concluding that the facts established that the individual defendant was a controlling corporate officer.  *Id.* at 33.  There, although the defendant "acted as a vice president" of the family-owned company, the contested facts precluded the plaintiff's motion for summary judgment.  The Second Circuit looked beyond the defendants *control* over the company and focused on whether he had a *personal* connection to the alleged wrongdoing.

73.     Courts may impose liability where the corporate officer had been convicted of engaging in a criminal conspiracy to defraud the pension funds.  *See Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 388 (2d Cir. 1989).

74.     Although Donal is the President and sole owner of Navillus, he has no personal involvement in any alleged "wrongdoing" against the pension funds.  *Lollo*, 35 F.3d at 33. Donal does not have operational control over Navillus' ERISA contributions, nor is he responsible for preparing and signing remittance reports.  *Lollo I*, 35 F. 3d at 33.  Navillus has a department dedicated to payroll and ensuring checks and remittance reports are properly issued. Moreover, Donal is not the owner of Time Square or ACS.  Donal has no involvement in the operations of either of those companies, specifically their payroll operations.  As a result, Donal has no involvement in the alleged wrongdoing.

75.     Helen is not a "controlling corporate official."  Helen has no operational or managerial control over Navillus.  She has no dominant or decision making authority with respect any of Navillus' business decisions, not to mention Navillus' pension fund contributions.  *See Lollo*, 35 F.3d at 33 (operational control of family company lay elsewhere).  Additionally, Helen has no personal relationship to the alleged wrongdoing.  Simply signing remittance reports and overseeing Navillus' payroll is not enough to saddle her with massive potential liability.  Indeed, the Plaintiffs admit that Navillus has not underpaid pension funds with respect to Navillus employees.

76.     Kevin is not a "controlling corporate official."  First and foremost, absent a finding that Time Square is an alter ego of Navillus, Kevin, as the sole owner of only Time Square, cannot be individually liable under ERISA for Navillus' pension obligations.  *See A.W. Farrell*, 2012 WL 4092598, at *17.

77.     In addition, Kevin has no personal involvement in the alleged wrongdoing.  Kevin resigned from Navillus in 2006 when he started Time Square.  (K. O'Sullivan Testimony)  Since then, Kevin has had no involvement in the management, day-to-day operations or any of the business affairs of Navillus (K. O'Sullivan Testimony)  Although Kevin officially sold all of his shares in Navillus to Donal in January 2015, he had been uninvolved with Navillus operations since 2006.  (K. O'Sullivan Testimony)  Kevin made no representations and had no involvement in Navillus' contributions to the union pension funds or how Navillus conducts its payroll.  *A.W. Farrell*, 2012 WL 4092598, at *17.  Thus, Kevin cannot be deemed a "controlling corporate official" of Navillus or any allegedly combined entity.

### (b)     *The Pension Funds Were Not Defrauded*

78.     Neither Donal, Helen, nor Kevin engaged in fraudulent conduct by (1) making a material false representation or omission of fact, (2) with knowledge of its falsity and with the

intent to defraud, (3) resulting in reasonable reliance, and (4) with damages resulting to the plaintiff funds. *Lollo*, 35 F.3d at 33; *see also A.W. Farrell*, 2012 WL 4092598 at *17 (holding that, in the absence of finding sufficient evidence to impose alter ego liability on the corporate defendants, no rational trier of fact could conclude defendants had an intent to defraud); *De-Con Mech. Contractors, Inc.*, 896 F. Supp. at 347 (granting defendants' motion to dismiss where the plaintiffs gave no indication as to the "frequency of the alleged underpayments, to whether there was a pattern, or if the individuals involved knew of the underpayments" and there was no showing of "specific misstatements or omissions by each of these individuals"). Thus, mere speculation into circumstantial conduct is not sufficient to allege fraudulent conduct.

79.     To establish a material misrepresentation, the plaintiffs must prove that the individuals  made a material false representation or omission of an existing fact in order to avoid paying benefit fund contributions. *Finkel*, 2010 WL 4392723, at *8 (finding this factor present when individual defendant's failure to account for union workers' hours). Navillus never made a material misrepresentation or omission by, for example, submitting inaccurate remittance reports.

80.     Neither Donal, Kevin nor Helen acted with any knowledge or intent to defraud. Mere allegations intended to support alter ego findings, such as start-up help to another company, are not enough to establish a clear intent to defraud. *See De-Con Mech. Contractors, Inc.*, 896 F. Supp. 342 (granting defendants' motion to dismiss, stating that "even if Plumbing were the alter ego of Mechanical this is not sufficient standing alone to support an allegation of fraud"). Further, a misrepresentation alone is not enough to establish the requisite intent to defraud. "Even if there was an underpayment or an omission from any documents given to plaintiffs, plaintiffs needed to state facts which would support the inference that such

- 49 -

underpayment or omission was deliberate." *De-Con Mech. Contractors, Inc.*, 896 F. Supp. 342

(granting defendants' motion to dismiss).  Conclusory allegations of intent are not sufficient.  In

*A.W. Farrell*, the court held that while it was undisputed that the defendants were "controlling

corporate officials," the court refused to hold them individually liable where the defendants had

testified at trial that "they had no knowledge or information regarding any fraudulent conduct, or

any concerted action to avoid CBA obligations." 2012 WL 4092598 at *17.  Accordingly, there

was no showing of any intent to defraud.

 81. Mere speculation into circumstantial conduct is not sufficient to allege fraudulent

conduct.  *See Lollo I*, 35 F.3d at 34.  There is no evidence of any undisclosed bank accounts,

cash payments, off-the-books payments, or false names used to sign remittance reports, or

schemes to defraud auditors and accountants.  Navillus, Time Square and ACS each have

separate and distinct payroll systems and bank accounts that are not interrelated.

 82. To establish reliance, plaintiffs must show that they themselves (not any third-

party) reasonably relied on the defendants' statements.  *Lollo II*, 148 F.2d at 196.  Plaintiffs

could not have reasonably relied on any "assurances of separate ownership" (or allegedly false

remittance reports) where, as here, they believed that Navillus was improperly operating as with

Time Square as its alter ego since 2006 when Time Square was first formed.  *See Time Square*

*Construction v. Mason Tenders*, Case No. 07-cv-7250 (S.D.N.Y.); *see Lollo I*, 35 F.3d at 34 ("It

is not apparent to us that the Funds were ever deceived by Steven's false statements.  To the

contrary, Steven has asserted that the Union at all times was fully aware of the company's

missed payments, that the Union and the company were actively engaged in negotiations during

the relevant period to rectify the company's delinquencies, and that the parties even entered into

a modification agreement to the 1984 CBA to alter the company's payment schedule.").  As in

*Lollo II*, the Plaintiffs here have no convincing argument that they reasonably relied on any alleged misrepresentations.

83.     Plaintiffs have suffered no damages.  Plaintiffs have failed to prove that any work covered by a CBA was diverted to ACS or Time Square.  None of the Time Square or ACS jobs consisted of work that could have been done by unionized workers at Navillus.  For example, with the exception of the Sugar Hill job, Time Square always operated as general contractor on non-public jobs, a role Navillus never would have sought or secured.  Nor were the Plaintiffs damaged by Time Square's securing the subcontracting bid on Sugar Hill.  Peter Downes, on behalf of Navillus, submitted a bid for the work that was denied because Navillus (a) was a union shop, and (b) was too expensive, and could not have secured the job.  Moreover, the Navillus bid had been rejected by Mountco before Time Square even submitted its bid.


Dated: July 7, 2017

**JONES DAY**


By: /s/ Willis J. Goldsmith
       Willis J. Goldsmith
       Lee A. Armstrong
       250 Vesey Street
       New York, New York 10281
       Tel: 212.326.3939

       *Attorneys for Defendants Navillus Tile,*
       *Inc., Donal O'Sullivan, and Helen*
       *O'Sullivan*